# REVISED May 16, 1997


IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT


_____

No. 95-60431
_____


JAKE AYERS, JR, Private Plaintiffs; BENNIE G THOMPSON,
United States Congressman, Second Congressional District,
Mississippi

                  Plaintiffs - Appellants

UNITED STATES OF AMERICA

                  Intervenor Plaintiff - Appellant

v.


KIRK FORDICE, Governor, Defendants/Senior Colleges; HINDS
JUNIOR COLLEGE, Board of Trustees; UTICA JUNIOR COLLEGE,
Board of Trustees; MISSISSIPPI DELTA JUNIOR COLLEGE; COAHOMA
JUNIOR COLLEGE; STATE OF MISSISSIPPI, Defendants

                  Defendants - Appellees

v.


LOUIS ARMSTRONG

                  Movant - Appellant


_____

Appeal from the United States District Court
for the Northern District of Mississippi
_____

April 23, 1997

## TABLE OF CONTENTS

I.    BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . 4

II.   STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . 10

III.  DISCUSSION . . . . . . . . . . . . . . . . . . . . . . 12

      A.    Admissions Policies and Practices . . . . . . . . . 12

            1.    Background Facts . . . . . . . . . . . . . . . 12

            2.    Undergraduate Admissions Standards . . . . . . . 15

                  a.    District court ruling . . . . . . . . . 15
                  b.    Arguments on appeal . . . . . . . . . . 22
                  c.    Analysis  . . . . . . . . . . . . . . . 26
                        i.    Rejection of plaintiffs' proposals . 28
                        ii.   Reliance on spring screening and
                              summer remedial program  . . . . . . 32
                        iii.  Elimination of existing remedial
                              courses  . . . . . . . . . . . . . . 34
                        iv.   Timing . . . . . . . . . . . . . . . 37
                  d.    Conclusions regarding undergraduate
                        admissions standards  . . . . . . . . . . 38

            3.    Scholarship Policies . . . . . . . . . . . . . 39

                  a.    District court ruling . . . . . . . . . 39
                  b.    Arguments on appeal . . . . . . . . . . 40
                  c.    Analysis  . . . . . . . . . . . . . . . 42
                  d.    Conclusions regarding scholarship
                        policies  . . . . . . . . . . . . . . . . 52

      B.    Enhancement of Historically Black Institutions  . . 53

            1.    Background Facts . . . . . . . . . . . . . . . 53

            2.    New Academic Programs  . . . . . . . . . . . . 54

                  a.    District court ruling . . . . . . . . . 54
                  b.    Arguments on appeal . . . . . . . . . . 60
                  c.    Analysis  . . . . . . . . . . . . . . . 61
                  d.    Conclusions regarding new academic
                        programs  . . . . . . . . . . . . . . . . 67

            3.    Land Grant Programs  . . . . . . . . . . . . . 68

                  a.    District court ruling . . . . . . . . . 68
                  b.    Arguments on appeal . . . . . . . . . . 70
                  c.    Analysis  . . . . . . . . . . . . . . . 71

               d.    Conclusions regarding land grant
                     programs . . . . . . . . . . . . . . . . 73

        4.    Duplication of Programs . . . . . . . . . . . 73

               a.    Fordice . . . . . . . . . . . . . . . . 73
               b.    District court ruling . . . . . . . . . . 74
               c.    Arguments on appeal . . . . . . . . . . 79
               d.    Analysis . . . . . . . . . . . . . . . . 80
               e.    Conclusions regarding program
                     duplication . . . . . . . . . . . . . . . 83

        5.    Funding . . . . . . . . . . . . . . . . . . . 83

               a.    District court ruling . . . . . . . . . . 83
               b.    Arguments on appeal . . . . . . . . . . 88
               c.    Analysis . . . . . . . . . . . . . . . . 89
               d.    Conclusions regarding funding . . . . . . 94

   C.    Employment of Black Faculty and Administrators . . 94

   D.    System Governance . . . . . . . . . . . . . . . . 99

IV.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . 101

Before KING, JOLLY, and DENNIS, Circuit Judges.

KING, Circuit Judge:

This case concerns the obligation of the State of Mississippi and the other defendants to dismantle the system of de jure segregation that was maintained in public universities in Mississippi. After we heard the initial appeal of this case in 1990, the Supreme Court established, for the first time, the standards for determining in the university context whether a state has met its affirmative obligation to dismantle its prior de jure system. We now review the district court's ruling following trial on remand to determine whether it erred in its application of these standards.

For the reasons set forth below, we affirm in part, reverse in part, and remand the case to the district court for further proceedings consistent with this opinion.

I. BACKGROUND

Mississippi's system of public four-year universities was formally segregated by race from its inception in 1848 through 1962, when the first black student was admitted to the University of Mississippi by order of this court. See Meredith v. Fair, 306 F.2d 374 (5th Cir.), cert. denied, 371 U.S. 828 (1962). The racial identifiability of Mississippi's eight public universities changed little during the decade following the landmark admission of James Meredith. The student composition of the University of Mississippi, Mississippi State University, Mississippi University

4

for Women, University of Southern Mississippi, and Delta State University (collectively, "historically white institutions" or "HWIs") remained almost entirely white, while that of Jackson State University, Mississippi Valley State University, and Alcorn State University (collectively, "historically black institutions" or "HBIs") remained almost entirely black.  See United States v. Fordice, 505 U.S. 717, 722 (1992).  The racial identifiability of these institutions persists to the present.[1]

Private plaintiffs initiated this class action[2] in 1975, complaining that Mississippi was maintaining a racially dual system of higher education in violation of the Fifth, Ninth, Thirteenth, and Fourteenth Amendments to the United States Constitution, 42 U.S.C. §§ 1981 and 1983, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d to 2000d-7.  The United States intervened as plaintiff and alleged violations of the Equal Protection Clause of the Fourteenth Amendment and Title VI.

For twelve years the parties attempted to resolve their differences through voluntary dismantlement of the prior

---

[1]  In the fall of 1993, the on-campus undergraduate enrollment was at least 75% white at each of the HWIs, and at least 93% black at each of the HBIs.

[2]  The class was certified by the court as:

[a]ll black citizens residing in Mississippi, whether students, former students, parents, employees, or taxpayers, who have been, are, or will be discriminated against on account of race in . . . the universities operated by said Board of Trustees.

Ayers v. Allain, 674 F. Supp. 1523, 1526 (N.D. Miss. 1987).

5

segregated system.  Unable to achieve ultimate agreement, the parties proceeded to trial in 1987.  The district court ruled that Mississippi had discharged its affirmative duty to dismantle the former de jure segregated system of higher education through its adoption and implementation of good-faith, race-neutral policies and procedures in student admissions and other areas. Ayers v. Allain, 674 F. Supp. 1523, 1564 (N.D. Miss. 1987) (Ayers I).  Sitting en banc, this court affirmed.  Ayers v. Allain, 914 F.2d 676 (5th Cir. 1990).  The United States Supreme Court granted certiorari.  Ayers v. Mabus, 499 U.S. 958 (1991).

The Supreme Court vacated the judgment and remanded for further proceedings, holding that the mere adoption and implementation of race-neutral policies was insufficient to demonstrate complete abandonment of the racially dual system. Fordice, 505 U.S. at 731, 743.  The Court stated that

> even after a State dismantles its segregative admissions policy, there may still be state action that is traceable to the State's prior de jure segregation and that continues to foster segregation. . . . If policies traceable to the de jure system are still in force and have discriminatory effects, those policies too must be reformed to the extent practicable and consistent with sound educational practices.

Id. at 729.  Applying this standard, the Court identified admissions standards, program duplication, institutional mission assignments, and continued operation of all eight public universities as a nonexclusive list of "constitutionally suspect" remnants of the prior de jure system, "for even though such policies may be race neutral on their face, they substantially restrict a person's choice of which institution to enter, and

6

they contribute to the racial identifiability of the eight public universities. Mississippi must justify these policies or eliminate them." Id. at 733. The Court directed that these and "each of the other policies now governing the State's university system that have been challenged or that are challenged on remand" be examined "in light of the standard that we articulate today." Id.

On remand, the district court ordered each party to submit proposed remedies "to resolve the areas of the State's liability pursuant to the Supreme Court mandate." Without conceding liability, defendant Board of Trustees of State Institutions of Higher Learning (the "Board")[3] responded by presenting a detailed proposal for modification of the higher education system. This proposal contained, among other provisions, uniform standards of admission for all universities, as well as a plan to merge Delta State University and Mississippi Valley State University into one institution to serve students in the Mississippi Delta.[4]

The private plaintiffs and the United States (collectively, "plaintiffs") responded by insisting that the range of

---

[3] The Board is responsible for the management and control of the eight public universities at issue in this case. MISS. CODE ANN. § 37-101-1 (1996). Its general powers and duties include, inter alia, managing all university property, disbursing funds, establishing standards for admission and graduation, and supervising the functioning of each institution. See id. § 37-101-15.

[4] The Board submitted its original proposal to the district court on October 22, 1992. The Board submitted a modified proposal shortly before trial. The proposed admissions standards and merger plan were contained in both.

constitutionally suspect policies and practices to be examined on remand had yet to be determined.[5]  Pursuant to a subsequent court order, plaintiffs identified the following policies and practices for examination:  admissions standards that allegedly deny black students equal access to higher education and tend to channel black students to the HBIs; the use of ACT scores as a basis for awarding undergraduate scholarships at the HWIs; maintenance of institutional mission assignments that largely follow historical racial designations; funding policies that disproportionately benefit the HWIs; allocation of academic programs that is unfavorable to the HBIs; allocation of land grant programs between Alcorn State and Mississippi State that is unfavorable to Alcorn; duplication of the HBIs' programs and course offerings at the HWIs; maintenance of facilities at the HBIs that are inferior to those at the HWIs; employment practices that perpetuate the racial identifiability of the universities and compensate faculty at the HBIs at a lower rate than faculty at the HWIs; maintenance of all eight institutions; and practices that limit the participation of black persons in system governance.  Trial commenced on May 9, 1994, following lengthy attempts at settlement.

After ten weeks of testimony, the district court made

---

[5]  Plaintiffs have alleged that the State's policies and practices violate both the Constitution and Title VI.  As the Supreme Court noted in Fordice, the reach of Title VI extends no further than the Fourteenth Amendment.  505 U.S. at 732 n.7.  We therefore follow the approach of the Supreme Court and treat the issues in this case as they are implicated under the Constitution.  Id.

additional findings of fact and conclusions of law. The district court found vestiges of <u>de jure</u> segregation in the areas of undergraduate admissions, institutional mission assignments, funding, equipment availability and library allocations, program duplication, land grant programs, and number of universities. <u>Ayers v. Fordice</u>, 879 F. Supp. 1419, 1477 (N.D. Miss. 1995) (<u>Ayers II</u>).[6] The district court entered a remedial decree on March 7, 1995.[7]

The remedial decree enjoins defendants from maintaining remnants of the prior system and engaging in practices impeding desegregation. Specific relief includes adoption of the uniform admissions standards proposed by the Board and allocation of additional resources to Jackson State University and Alcorn State University. The district court did not order implementation of the Board's proposal to consolidate Delta State University and Mississippi Valley State University. The decree establishes a Monitoring Committee to monitor implementation of the terms and obligations imposed by the decree. The Monitoring Committee is to consist of three disinterested persons with experience in the field of higher education, agreed upon by the parties and

---

[6] In addition, the district court found that the practice of maintaining participation in racially identifiable athletic conferences is traceable to <u>de jure</u> segregation but does not have segregative effects. Athletic programs are not an issue in this appeal.

[7] The remedial decree is set forth in its entirety in the opinion below, <u>Ayers II</u>, 879 F. Supp. at 1494-96. We limit our discussion to those aspects of the remedial decree pertinent to this appeal.

9

appointed by the court.  The Monitoring Committee is to receive and evaluate reports required of defendants and make recommendations to the district court, which has retained jurisdiction over the action.[8]

Plaintiffs now contend that the district court left in place practices that are traceable to the prior dual system and that have discriminatory effects and adopted reforms proposed by the Board without examining the soundness or practicability of alternative, less discriminatory proposals.  Issues on appeal encompass undergraduate admissions standards, scholarship criteria, enhancement of historically black universities, system governance, and employment.[9]  No party appeals the district court's rejection of the Board's consolidation proposal.

## II. STANDARD OF REVIEW

The standard set forth by the Supreme Court in Fordice guides our review of the district court's judgment.  Fordice established that "a State does not discharge its constitutional obligations until it eradicates policies and practices traceable

---

[8]  In an order entered on March 1, 1996, the district court stayed appointment of the Monitoring Committee, along with any reports required to be made to the Monitoring Committee, pending completion of "the appellate process."  We see no reason why the stay contemplated by the March 1 order should continue.  We assume that the stay will be vacated and that the Monitoring Committee will be activated promptly.

[9]  The scope of private plaintiffs' argument on appeal is broader in some respects than that of the United States, although the two positions overlap considerably.  We note distinctions where relevant.

to its prior de jure dual system that continue to foster segregation." 505 U.S. at 728. More specifically,

> [i]f the State perpetuates policies and practices traceable to its prior system that continue to have segregative effects -- whether by influencing student enrollment decisions or by fostering segregation in other facets of the university system -- and such policies are without sound educational justification and can be practicably eliminated, the State has not satisfied its burden of proving that it has dismantled its prior system.

Id. at 731. We have read Fordice to require that "each suspect state policy or practice be analyzed to determine whether it is traceable to the prior de jure system, whether it continues to foster segregation, whether it lacks sound educational justification, and whether its elimination is practicable." United States v. Louisiana, 9 F.3d 1159, 1164 (5th Cir. 1993). The State's liability depends upon these factors. Id.[10]

Once liability is found, the offending policies and practices "must be reformed to the extent practicable and consistent with sound educational practices." Fordice, 505 U.S. at 729. "[S]urely the State may not leave in place policies rooted in its prior officially segregated system that serve to maintain the racial identifiability of its universities if those policies can practicably be eliminated without eroding sound

---

[10] At this stage in a desegregation case, a state's "liability" consists of its obligation to remedy remnants of a prior de jure system for which constitutional liability has already been established. In Louisiana, we used the term "liability" in this sense of an affirmative obligation to remedy vestiges of the prior system. In the interest of consistency, we continue to use "liability" in this sense here, albeit with the understanding that the liability of the State of Mississippi, as a threshold matter, stems from its operation of a de jure system.

11

educational policies." Id. at 743. Accordingly, we have interpreted the directives of Fordice "as recognizing the need to consider the practicability and soundness of educational practices in determining remedies as well as in making an initial determination of liability." Louisiana, 9 F.3d at 1164.

We apply the directives of Fordice in conjunction with general standards of appellate review. This appeal challenges elements of the district court's remedial decree and implicates several of its findings and conclusions. We do not disturb the district court's findings of fact unless they are clearly erroneous, although we freely reassess its conclusions of law under the de novo standard of review. Ross v. Houston Indep. Sch. Dist., 699 F.2d 218, 226 (5th Cir. 1983). A third standard applies to our review of the remedial decree itself. A desegregation remedy is an exercise of a trial court's equitable power and as such is reviewable, within the context of Fordice, for abuse of discretion. Cf. Valley v. Rapides Parish Sch. Bd., 702 F.2d 1221, 1225 (5th Cir.), cert. denied, 464 U.S. 914 (1983).


III. DISCUSSION

A.   Admissions Policies and Practices

1.   Background Facts

In 1961, less than one week after James Meredith applied to the University of Mississippi, the Board adopted a policy requiring all applicants for undergraduate admission to any state

institution of higher education to take the American College Test ("ACT"). Ayers I, 674 F. Supp. at 1530-31. Several months later, the Board authorized each university to set a minimum ACT score for eligibility for admission. Id. at 1531. By 1963, the University of Mississippi, Mississippi State University, and the University of Southern Mississippi required an ACT composite score of at least 15 for all freshmen applicants. Id. At the time, the average ACT score among white students was 18, while that for black students was 7. Fordice, 505 U.S. at 734.

When this case was tried initially in 1987, admissions standards for first-time freshman varied along with the historical racial identifiability of each institution. Four HWIs continued to require a composite score of at least 15 on the ACT for automatic admission; the other HWI, Mississippi University for Women, required a score of 15-17 together with a high school grade point average of at least 3.0 on a 4.0 scale, or a score of at least 18. Ayers I, 674 F. Supp. at 1533-34. The HBIs required a minimum ACT composite score of 13. Id. at 1534.[11]

Based on the undisturbed factual findings of the district court -- and unmoved by lower court determinations that the admissions standards derived from policies enacted in the 1970s to redress the problem of student unpreparedness -- the Supreme Court concluded in Fordice that the policies were traceable to

_____

[11] The HBIs maintained more liberal exceptions policies than the HWIs, although no university could enroll a student with an ACT score below 9. See Ayers I, 674 F. Supp. at 1533-34.

13

the de jure system, were originally adopted for a discriminatory purpose, and continued to have discriminatory effects. 505 U.S. at 734. The Court found that the minimum ACT requirements "restrict[ed] the range of choices of entering students as to which institution they may attend in a way that perpetuate[d] segregation." Id. Those students who received ACT scores too low to meet the admissions requirements at the HWIs were restricted to the HBIs or community colleges if they wanted a higher education. Id. at 734-35. As the Court stated, "[p]roportionately more blacks than whites face[d] this choice: In 1985, 72 percent of Mississippi's white high school seniors achieved an ACT composite score of 15 or better, while less than 30 percent of black high school seniors earned that score." Id. at 735. The Court also deemed "constitutionally problematic" the fact that the State denied automatic admission if an applicant did not achieve the minimum ACT score specified for a particular institution, without also considering high school grades as an additional factor in predicting college performance. Id. at 736.[12]

Plaintiffs' challenges on remand included the use of differential ACT-based admissions policies at the HWIs and HBIs, as well as the use of ACT cutoff scores and alumni connection in

_____

[12] The Court found significant the fact that the disparity between black and white students' grade averages was much narrower than the gap between their average ACT scores, suggesting that an admissions formula that included grades would increase the number of black students eligible for automatic university admission. Fordice, 505 U.S. at 736-37.

14

the award of undergraduate scholarships at the HWIs.[13]  The

district court's ruling on each of these issues is now before us

on appeal.

> 2.  Undergraduate Admissions Standards

> a.  District court ruling

The district court concluded that "[u]ndergraduate

admissions policies and practices are vestiges of de jure

segregation that continue to have segregative effects."  Ayers

II, 879 F. Supp. at 1477.  More specifically, the court found

that the admissions standards in place at the time of the 1987

trial were traceable to the prior de jure system and continued to

have segregative effects in a system where racially identifiable

institutions offer numerous duplicative academic programs.  Id.

at 1434.  The court held that defendants had a duty to eradicate

use of the ACT cutoff score "as a sole criterion for admission to

the system when the ACT is used in conjunction with differing

admissions standards between the HBIs and HWIs."  Id.[14]

---

[13]  Plaintiffs also challenged policies and practices
pertaining to admissions exceptions.  The district court's
finding that no such policies or practices are traceable to the
de jure system is not contested on appeal.

[14]  The court did not rule that use of an ACT cutoff is per
se unlawful.  "Rather, its particular use in any circumstance
must be examined to consider whether as a component of the policy
challenged, the same is traceable to prior de jure segregation."
Ayers II, 879 F. Supp. at 1434.

Significantly, despite plaintiffs' claims that the addition
of ACT scores to high school grades as a predictor of freshman
grades improves the prediction only marginally, the district
court concluded that the ACT was "a sound component of the
admissions decision for the reason that the ACT, in combination
with high school grades, remains a better predictor of academic

15

Although admissions standards had been modified somewhat by the time of the trial on remand, the district court found that they "basically utilized a version of the 1987 standards with various exceptions." Id. at 1431. In 1989, the ACT was replaced by the Enhanced ACT. Id. at 1430. Scores on the two tests are not equivalent; the American College Testing Program accordingly publishes concordance tables that correlate scores on the old ACT and Enhanced ACT according to percentile rank.[15] The introduction of the Enhanced ACT prompted the Board to solicit recommendations from the eight universities for revised admissions standards based on the new test. Each HWI recommended use of an Enhanced ACT score of 18 for regular admission, which approximated the previous standard of an ACT score of 15. Each HBI recommended use of an Enhanced ACT score of 15 for regular admission, the concordant value of which was 11 on the old ACT. Because the HBIs had previously required an ACT score of at least 13 for regular admission, this recommendation represented an effective lowering of admissions standards at these institutions.[16] Throughout the system, students not qualifying

_____

performance than either criterion alone." Id. at 1482. This conclusion is supported by the record.

[15] An ACT score of 15, for instance, has a concordant value of 18 on the Enhanced ACT, meaning that a score of 15 on the ACT would be in the same percentile ranking as a score of 18 on the Enhanced ACT.

[16] Private plaintiffs quarrel with the district court's characterization of the change in the admissions standard at the HBIs as a "lowering," arguing that, viewed in historical context, this change merely restored some of the access that had been foreclosed by an earlier increase in minimum ACT requirements.

for regular admission could be admitted as "high risk" exceptions. The recommended Enhanced ACT scores for high risk applicants ranged from 14 to 17 at the HWIs, and from 12 to 14 at the HBIs. The Board approved all recommendations.[17] Differential admissions standards thus persisted in the system through the 1994 trial and, as found by the district court, "resulted in the 'channeling effect' described in Fordice." Id. at 1434. The district court's remedial order responded to the standards in place in 1994.[18]

Defendants proposed, and the district court ordered implementation of, new admissions criteria that standardize requirements at all eight universities beginning with applications for admission in the fall of 1996. The new criteria

We review the district court's ruling against this backdrop and in light of evidence concerning educational soundness.

[17] The district court noted that although the lower ACT requirements at the HBIs were originally proposed by the HBI presidents, "it is the Board's responsibility to manage the higher education system in accordance with constitutional principles." Ayers II, 879 F. Supp. at 1434.

[18] While it found that admissions policies continued to have segregative effects, the district court also found that "there is no per se policy or practice of minimizing the participation of African-Americans in the [higher education] system." Ayers II, 879 F. Supp. at 1435. The court found credible evidence indicating that defendants had made substantial progress toward increasing minority access to higher education. See id. at 1433, 1435. In Mississippi, the ratio of the State's share of the nation's black enrollment in public four-year institutions to its share of the nation's black population is more favorable than the national mean and that of many non de jure states. See id. at 1435. Private plaintiffs appear to contend that the district court's finding of no current per se policy of limiting access to the higher education system is clearly erroneous. We conclude that any such contention is without merit.

grant "regular admission"[19] to applicants who have (1) a GPA of at least 3.20 in a designated core curriculum, (2) a GPA of at least 2.50 in the core curriculum or class rank in the top 50% and an Enhanced ACT score of at least 16, or (3) a GPA of at least 2.0 in the core curriculum and an Enhanced ACT score of at least 18.  Id. at 1477-78.

The admissions policy ordered by the district court provides an important alternative to regular admission through a spring screening and summer remedial program for applicants who do not meet the requirements for regular admission.  Students participating in the spring screening process will take the Mississippi College Placement Examination (the "accuplacer") during the spring of their senior year in high school.  Based upon these scores, Enhanced ACT subtest scores, and counselor interviews, students will either be admitted for the fall semester or invited to participate in the summer remedial program.[20]  The summer program is designed to provide ten to eleven weeks of remedial instruction in reading, writing, and mathematics, taught both in traditional classroom settings and

_____

[19]  "Regular admission" is the term used throughout the district court opinion, and will be used herein, to denote automatic admission based on the criteria listed in the text, as distinguished from admission via the spring screening and summer remedial program, discussed infra.  See Ayers II, 879 F. Supp. at 1477-78 & n.297.

[20]  It appears, based on the language of the Board's proposal and testimony during trial, that some applicants who participate in spring screening may not be admitted to the summer remedial program and will be advised to pursue other educational options.

18

through computer-assisted individual components. Id. at 1478. In addition, the program plan incorporates cultural and recreational activities to "climatize" students to the college campus. Id.[21] Those students who successfully complete the summer program, by passing at minimum the remedial English and mathematics courses, will be admitted in the fall.

The district court found that "the new admissions standards through their uniformity will eliminate the prior segregative effects of the previous differential admissions standards between the HBIs and HWIs, noted by the Supreme Court in Fordice." Id. at 1481. The district court found that as compared with the standards litigated in the 1987 trial, the new standards would result in an overall increase in the number of black students eligible for regular admission to the university system.[22] As

_____

[21] Although the district court made no specific findings in this regard, the undisputed evidence indicates that the summer remedial program is a departure from past remedial practices within the university system. Prior to the district court's order, full semester remedial courses were offered at each university. Although students who are granted admission via the summer program must participate in a year-long academic support program designed to provide individualized support for marginally prepared students enrolled in regular academic credit courses, apparently many of the remedial courses previously offered during the academic year are to be eliminated under the new plan. See Part III.B.2.c.iii infra.

[22] The new standards were predicted to have the following impact:

(a) the pool of black students eligible for regular admission to a public HWI will increase from approximately 32.4% to 52.5%; (b) the pool of black students eligible for regular admission at the HBIs in 1995 will be increased from approximately 45.3% to 52.5%; (c) the pool of black students eligible for admission to the system as a whole will also increase

19

compared with the standards in place at the time of the 1994 trial, which were less stringent than in 1987 as a result of the 1989 changes in requirements at the HBIs, the new standards would result in an overall decline in the percentage of black students eligible for regular admission to the system.[23] The district court noted, however, that the summer program offers a distinct opportunity for applicants to gain admission. Id. at 1479.[24] The court found the summer program to be "credible and educationally advanced. In its proposed form, it is considered by its developers as an educationally sound developmental system." Id. at 1481. The district court concluded that

> [w]hile the new admissions standards may reduce the number of black students eligible to be admitted to the system without remedial courses required, it is not evident that the new standards will actually reduce the number of black students ultimately admitted to the system as either regular or remediated admittees.

Id.

Finally, although the State's community college system is

_____

under the proposed 1995 standards as compared with the 1987 standards.

Ayers II, 879 F. Supp. at 1479.

[23] While 68.2% of black high school graduates who took the ACT were eligible for regular admission to some university in the system at the time of the 1994 trial, the new standards were projected to reduce this figure to 52.5% or 50.7%. Ayers II, 879 F. Supp. at 1479.

[24] The district court stated this finding in terms of the "summer program" only. We note that, as described by the district court and in the record, the spring screening program can lead to admission for the fall semester without participation in the summer remedial program. See Ayers II, 879 F. Supp. at 1478.

20

the subject of a separate lawsuit, the district court made findings and ordered relief in this regard because the community college system is relevant to the issue of access to higher education.  The court found evidence that the community college system "can have an impact on the admissions policies of the universities and their ability to further diversify institutions of higher learning."  Id. at 1475.  The court also found, however, that the community college system in Mississippi is not providing remediation for students unprepared for four-year institutions "to any great degree."  Id.  The district court apparently linked this to at least two factors.  First, in contrast to the open admissions policy that prevailed at all community colleges when this case was tried in 1987, some community colleges now require minimum ACT scores for admission to certain programs.  Id. at 1474-75.[25]  Second, the "overwhelming majority" of students who start at the community college level do not transfer to four-year universities.  Id. at 1475.  The University of Southern Mississippi has the highest proportion of transfer students in its student body, largely attributable to its recruiting efforts and articulation agreements with several community colleges in surrounding regions.  Id.  Black students transfer at a significantly lower

---

[25]  The use of ACT cutoffs for admission to community colleges is not an issue in this case, and the district court did not make findings or conclusions with respect to the constitutionality of this practice.  Accordingly, we do not address this aspect of the community college system in our opinion.

rate than whites, possibly because a high percentage of black students in community colleges are enrolled in two-year vocational programs.

The district court concluded that the State "is losing a valuable resource in not coordinating the admissions requirements and remedial programs between the community colleges and the universities." Id. The remedial decree contains a provision ordering the Board "to study the feasibility of establishing system-wide coordination of the community colleges in the State in the areas of admissions standards and articulation procedures," and to report its findings to the Monitoring Committee. Id. at 1496.

b.   Arguments on appeal

The district court's finding that undergraduate admissions policies and practices are vestiges of de jure segregation that continue to have segregative effects is not contested on appeal. Plaintiffs do contest the remedy thereupon ordered.

Plaintiffs' challenge to the admissions remedy has two parts. First, plaintiffs argue that the district court's adoption of the Board's proposed standards was improper because these standards will significantly reduce the number of black students eligible for regular admission to the university system, and thereby disproportionately burden black students with a loss of educational opportunity. Plaintiffs assert that the district court was obligated by Fordice to consider the educational soundness of alternative proposals that would have excluded fewer

22

black students, but failed to do so.

Second, plaintiffs argue that the district court's reliance on the spring screening and summer remedial program to compensate for the projected decline in regular admission of black students was inappropriate because the program was untested and incompletely defined at the time of trial. Plaintiffs contend that although the district court found the summer program to be "credible and educationally advanced," it did not specifically find that the program would be an effective means of identifying students capable of succeeding in college or that it could achieve the same results as "existing remedial programs."[26] In addition, plaintiffs argue that the summer program is not a viable option for the many black students who must work during the summer in order to afford to go to college in the fall, and that the community college system currently does not provide an adequate alternative. Plaintiffs therefore argue that the Board should be required to maintain existing remedial courses and to adopt standards that minimize any reduction in the number of black students eligible for admission, at least during the period that the summer program is being tested and the community college

---

[26] We understand "existing remedial programs" to mean the various combinations of remedial, or basic skills, courses and other forms of educational assistance, such as tutoring and counseling, that have been offered by the eight universities. In this record, "remedial education" and "remediation" are to some degree used interchangeably with "developmental education" and "developmental studies." We use the term "remedial programs" to refer to the entire range of such educational assistance, and the term "remedial courses" to refer to courses that teach basic, pre-college skills.

system undergoing change.

Although their criticisms of the new admissions standards coincide, private plaintiffs and the United States advocate different admissions policies as alternatives. Private plaintiffs proposed below and re-urge here adoption of a tiered admissions policy, in which admissions requirements vary along with the mission of each university,[27] with the most accessible tier having "open admissions." By "open admissions," private plaintiffs mean a policy of granting admission to students with a high school diploma and ACT score of 10. Id. at 1480. Under private plaintiffs' proposal, the three comprehensive universities would use the admissions standards proposed by the Board, and Jackson State University would have open admissions for eight years with the option thereafter of gradually raising admissions standards to the level prevailing at the comprehensive universities. Id. Existing remedial programs would be strengthened in this scheme.

The United States proposed below and re-urges here an admissions policy, which was presented to the Board in 1992 but

---

[27] The eight universities are grouped into three classes according to their programmatic mission. University of Mississippi, University of Southern Mississippi, and Mississippi State University are "comprehensive" universities, which offer the greatest range and highest level of degree programs. Jackson State University has an "urban" mission to serve the urban community of Jackson, Mississippi, in which it is located. Alcorn State University, Delta State University, Mississippi University for Women, and Mississippi Valley State University are "regional" universities that focus primarily on undergraduate education. In private plaintiffs' framework, the regional universities would constitute the most accessible tier.

24

never adopted, in which regular admission would be granted to students achieving (1) a 2.0 GPA in the core curriculum and a minimum of 16 on the Enhanced ACT or (2) a 2.50 GPA in the core, a ranking in the top 50% of the class, and a minimum of 13 on the Enhanced ACT.[28]  The United States contends that under this standard, an estimated 73.6% of black students who took the ACT would qualify for admission, as compared to 52.5% or 50.7% under the proposal adopted by the district court.  The United States states that "ACT predictive data indicate that, at the [HBIs], where remedial instruction was given, freshmen with these qualifications could be expected to achieve at least a C average."  U.S. Br. at 12.

Defendants argue that the new admissions criteria wholly eliminate prior policies traceable to de jure segregation. Defendants contend that the new admissions standards sufficiently address the concerns articulated in Fordice because they do not differentiate between universities according to historical racial designation and do not rely on the ACT as the sole criterion for admission.  Defendants argue that under Fordice, the traceable admissions policy was the Board's particular use of differential ACT cutoff scores, which effectively channeled black students to the HBIs, and not use of the ACT per se.  Accordingly, defendants contend that the new policy is not traceable to the prior de jure

---

[28]  The district court noted that the United States "has also suggested adoption of a 2.5 overall GPA for admission to all universities."  Ayers II, 879 F. Supp. at 1480.  The United States does not urge this standard on appeal.

system and may be implemented because the record discloses that it is educationally sound and was not adopted for a discriminatory purpose. While defendants maintain that <u>Fordice</u> does not require the district court to select the educationally sound alternative with the least discriminatory effect, they argue that even if the district court did have such an obligation, its findings regarding the segregative effect and educational soundness of the new admissions standards effectively discharged it.

c.   Analysis

The district court's findings that the new criteria for admission are educationally sound and will not perpetuate segregation within the system are not challenged on appeal. Plaintiffs contend, rather, that the district court erred by failing to consider the educational soundness of proposals that would have resulted in a smaller reduction in the number of black students excluded from regular admission.

We agree with plaintiffs that it would be inappropriate to remedy the traceable, segregative effects of an admissions policy in a system originally designed to limit educational opportunity for black citizens by adopting a policy that itself caused a reduction in meaningful educational opportunity for black citizens. We do not, however, understand the district court to have done so. The district court considered and rejected alternative proposals as educationally unsound, and expressly contemplated that the remedial route to admission could alleviate

26

any potential disproportionate impact on those black students who are capable, with reasonable remediation,[29] of doing college level work.

We understand the district court to have determined, in the specific context of formulating an appropriate remedial decree in this case under Fordice, that access to higher education must be provided only to those applicants who can demonstrate, based on educationally sound and constitutionally permissible indicators, an ability (with reasonable remediation) to do college level work and who therefore have a real prospect of earning a degree.[30] The court found that admission of students unprepared to do college level work may result in significant attrition accompanied by unprofitable debt accumulation. Ayers II, 879 F. Supp. at 1435.[31] Fordice does not require that all students who

---

[29] The record reflects that each of the universities at issue here has for many years recognized that remediation is appropriate to enable certain students successfully to complete a college education. The amount of remediation that has been provided has varied among the universities. We recognize that how much remediation is appropriate or "reasonable" is informed by concepts of practicability and educational soundness.

[30] All Mississippi universities at issue here require students to achieve at least a C average in order to graduate. Indeed, as indicated in our discussion below, all parties key their arguments regarding the educational soundness of alternative admissions proposals to this standard.

[31] The court found that Louisiana institutions, which maintain open admissions, "suffer from a very high attrition rate resulting in students owing one, two or three years of college expenses and having little or nothing to show for it." Ayers II, 879 F. Supp. at 1435. Defendants' expert, Dr. James Wharton, testified that access to four-year institutions in Louisiana is "not meaningful access because we also have tremendous attrition and students get hurt in that attrition." Likewise, Dr. Hunter Boylan testified that "[a]ccess without an opportunity to succeed

would have been admitted under the prior, unconstitutional admissions standards be admitted under the reformed admissions standards without regard to the educational soundness of the reformed standards. Instead, the district court's mandate under <u>Fordice</u> was limited to reforming traceable, segregative policies "to the extent practicable and consistent with sound educational practices." 505 U.S. at 729.[32] Having found admissions policies and practices to be traceable to the <u>de jure</u> system and to have present segregative effects, the district court properly focused its consideration of alternative admissions policies on their educational soundness and potential to eliminate existing segregative effects; its focus, in turn, on ability to do college level work is consistent with both the evidence as presented by plaintiffs and <u>Fordice</u>.

i. <u>Rejection of plaintiffs' proposals</u>

isn't really access. If you have an open door it quickly becomes a revolving door."

[32] The Court in <u>Fordice</u> declined to adopt a standard that would require the State to eliminate insofar as practicable all present discriminatory effects of the prior system:

> To the extent we understand private petitioners to urge us to focus on present discriminatory effects without addressing whether such consequences flow from policies rooted in the prior system, we reject this position. . . . Though they seem to disavow as radical a remedy as student reassignment in the university setting, their focus on "student enrollment, faculty and staff employment patterns, [and] black citizens' college-going and degree-granting rates" would seemingly compel remedies akin to those upheld in <u>Green v. School Bd. of New Kent County</u> were we to adopt their legal standard.

505 U.S. at 730 n.4 (citations omitted) (second alteration in original); <u>see also</u> <u>id.</u> at 732 n.6.

The district court set forth in detail the respective admissions standards proposed by private plaintiffs and the United States.  See Ayers II, 879 F. Supp. at 1479-80.  Although the district court credited expert testimony indicating that differential or tiered admissions standards are both sound and routinely used, id. at 1482, it did not adopt private plaintiffs' proposal in light of its finding that the open admissions component of this proposal was educationally unsound.  Id. at 1481-82.  The district court found that

> universities across the nation generally are moving toward higher admissions requirements, not lower ones. According to the testimony, students in working toward goals will usually do that which is expected of them. If they believe they need not prepare themselves for college by taking the core curriculum in high school, they will not do so.  Such unpreparedness may bring them to college campuses unable to execute the rigors of college work and result in low retention rates, college debt accumulations and years expended with no degrees. . . . It has also been shown that institutions of higher learning which open their doors to unprepared students via open admissions not only do a disservice to many of the admittees, but can lower the quality and, concurrently, the prestige of the institutions generally.

Id. at 1482-83.  These findings are not clearly erroneous, and the district court did not abuse its discretion in rejecting private plaintiffs' proposal.

Even assuming that tiered admissions could be implemented without open admissions as a component thereof, it was not an abuse of discretion in this context for the district court to opt instead for a policy based on uniform standards.  In the Mississippi system of higher education, differential admissions criteria were rooted in the de jure past and fostered both

29

segregation of the races and the public perception that the institutions with lower standards -- the HBIs -- were of inferior quality.  Id. at 1477, 1486.  A tiered system would continue to differentiate among institutions based on their respective missions.  See id. at 1482.  In light of the history of differential admissions in Mississippi higher education, and in light of its finding that policies and practices governing the missions of the universities are traceable to de jure segregation and continue to have segregative effects, the district court was within its discretion to unify standards across institutions.

The standards proposed by the United States met this interest in uniformity, but were fixed at a level that the district court found to be educationally unsound.  Under the United States's proposal, students with a 2.5 GPA and a class rank in the top 50% would qualify for regular admission with an Enhanced ACT score of 13.  While this formula adds high school grades and class rank into the eligibility determination, it nevertheless represents a lowering of the ACT score requirement from even post-1989 levels at the HBIs.  In contrast, students with identical qualifications would need an Enhanced ACT score of 16 to qualify for regular admission under the Board's proposal. The district court concluded that the requirements for regular admission under the Board's proposal were "quite moderate," and stated that it "does not find persuasive or educationally sound the adoption of open admissions or continually lowering admissions standards, as was done at the HBIs after the 1987

trial." Id. We understand this finding to encompass the standards endorsed by the United States.

Both plaintiffs and defendants cite ACT predictive data in support of their respective proposals. The United States points out that such data indicates that students with the minimum qualifications they propose would be expected to achieve at least a C average by the end of their freshman year at each of the HBIs. We note that such students are predicted to complete their freshman year with grades significantly below a C average, the minimum required for graduation, at any of the HWIs. See PP 39-R. Defendants highlight a different aspect of the same predictive data, which the district court apparently found persuasive: students with the minimum qualifications proposed by the Board would be expected to complete their freshman year with a C average or slightly below at each of the HWIs. The district court's finding that the Board's proposed standards are "quite moderate" is indeed supported by the evidence. On this record, the district court could fairly conclude that it would be educationally unsound to adopt an admissions policy under which students could do college level work at only three institutions in the system.[33] We realize that no set of standards is without its flaws. Significantly, as we discuss below, the standards that the district court did adopt provide an alternative route to

---

[33] Under the United States's proposal, the three institutions at which students could do college level work are the HBIs. The standards proposed by the United States therefore could have the perverse, albeit unintended, effect of perpetuating the channeling effect described in Fordice.

31

admission that does not rely on ACT scores whatsoever. The

district court's decision to order implementation of this system,

rather than dilute standards for regular admission, was a proper

exercise of its discretion.

ii.   Reliance on spring screening and summer
      remedial program

The district court recognized the likelihood that the

Board's standards would reduce the number of black students

eligible for regular admission as compared to then-prevailing

standards,[34] and chose to adopt them only in conjunction with the

additional opportunity to gain admission through the spring

screening and summer remedial program. The district court was

unable to conclude that the new standards, which provide an

alternative route to admission that does not rely on ACT scores

whatsoever,[35] would actually reduce the total number of black

students eligible for admission either as regular or remediated

admittees. In light of the district court finding that lowering

admissions standards "as was done at the HBIs after the 1987

trial" is educationally unsound, the court apparently determined

that to the extent any reduction in the number of black students

eligible for admission relative to post-1989 standards does take

---

[34]   On the other hand, the district court found that under
the Board's standards, the number of black students eligible for
regular admission would increase relative to standards in
existence at the time of trial in 1987. See Ayers II, 879 F.
Supp. at 1479.

[35]   According to the Board, any high school graduate,
regardless of academic performance, may participate in spring
screening. There is no requirement that participants in spring
screening take the ACT. Bd. R-202.

32

place, it may reflect the educational unsoundness of prior policies. As contemplated, the new standards should result in the identification and admission of those applicants who, with reasonable remediation, can do college level work. This is consistent with Fordice's mandate of a reformed admissions policy that is practicable and educationally sound.

The district court also recognized that the spring screening and summer remedial program was untested and its standards not fully established at the time of trial. See id. at 1478-79, 1481. We think that the program was sufficiently defined that the district court did not abuse its discretion in ordering its implementation. If, however, as plaintiffs suggest may be the case,[36] the spring and summer program is unable to any significant degree to achieve its intended objectives of identifying and admitting otherwise eligible applicants -- i.e., applicants who could, with reasonable remediation, successfully complete a regular academic program -- for whatever reason, then the program must be reevaluated.[37] The district court's proper

_____

[36] In its Motion to Expedite the Appeal, the United States presents recently discovered evidence concerning the first year's implementation of the new standards and the spring and summer program, which may demonstrate that the new standards exclude a significant percentage of black students who would have been eligible for regular admission at the time of the 1994 trial, and that the spring and summer program offers limited ameliorative potential. Such evidence, however, is not part of the record before us and we do not consider it in any substantive way for purposes of this appeal.

[37] The district court's conclusion that the Board's obligation to graduating high school students does not encompass "students ineligible for regular admission under its proposal, who do not choose to participate in a screening process for

33

retention of jurisdiction over this action indicates its intent to examine this important component of the admissions system once the relevant data becomes available.[38]  If the district court ultimately concludes that the spring screening and summer remedial program (as it may be modified) is unable to any significant degree to achieve its objectives, then the court should, if possible, identify and implement another practicable and educationally sound method for achieving those objectives.

### iii. Elimination of existing remedial courses

We have thus far addressed the spring and summer program as a component of the reformed admissions policy.  We turn now to the argument made by the plaintiffs that the district court erred in relying upon the summer remedial program to replace the existing remedial courses in the absence of a finding that the summer program could achieve the same results as the universities' existing remedial courses in enabling students to succeed in and graduate from college.

We note in this connection that the plan proposed by the Board provides that "[d]evelopmental studies are only offered

---

academic placement analysis," Ayers II, 879 F. Supp. at 1481, is too sweeping insofar as it may include students who, with reasonable remediation, are capable of doing college level work but who self-select out of the spring or summer program because of the unique burdens imposed by the program or flaws in its design or operation.

    [38]  Cf. Green v. County Sch. Bd., 391 U.S. 430, 439 (1968) ("Moreover, whatever plan is adopted will require evaluation in practice, and the court should retain jurisdiction until it is clear that state-imposed segregation has been completely removed.").

during the summer session." In ordering implementation of this plan, the district court tacitly approved the elimination of most, perhaps even all, of the remedial courses that had been offered by all the universities at issue here, most notably by the HBIs. This is a troubling decision, implicating the reformed policies for regular admission as well as the spring screening and summer remedial program. On the one hand, there was evidence to indicate that an intensive, structured program of remedial instruction during the summer months prior to a student's immersion in the college experience may actually be more effective at preparing students for college than a more diffused program of remedial instruction throughout the academic year. On the other hand, the district court appeared to base its decision not to consolidate Mississippi Valley State University with Delta State University, at least in part, on the significant percentage of students enrolled in remedial, or developmental, education at Mississippi Valley and on Mississippi Valley's role as "a significant nurturer of underprepared blacks," id. at 1492, a role that the district court apparently did not want to see eliminated.[39] Further, it is not clear to what extent the operative predictive data assumes the existence of remedial programs insofar as it is based on historical achievement. It is clear that the predictive data relied upon by the State in

---

[39] We find it significant that the presidents of Mississippi's HBIs testified that the existing remedial programs at the HBIs are essential to meet the needs of the students they serve and at least one questioned whether the summer remedial program would adequately replace them.

35

support of its argument that its proposed admissions standards were "quite moderate" indicate that students who are admitted with the minimum qualifications required under the new standards are not predicted to achieve a C average during their first year at at least three of the HWIs. This suggests, as defendants note in their brief and indicated at oral argument before this court, that many students who are admitted under the reformed standards will need "substantial educational assistance," possibly including remedial courses.[40] Remedial courses may be an important part of the admissions policy at any school in which a significant number of students are not predicted to achieve a C average during their first year.

Plaintiffs did not challenge the State's existing remediation policies as traceable to the de jure era. There was therefore no requirement, under Fordice, for reformation of those policies as such. However, the Board's proposed admissions standards (Bd. R-202) treated the adoption of the summer program and the elimination of the existing remedial courses as components of its admissions standards, and the district court, in ordering the implementation of the Board's proposal, effectively did the same. The principle that apparently underlies the Board's admissions policy (and, therefore, the

---

[40] There may be a distinction between students who qualify for regular admission but who are also in need of remedial education and students who do not so qualify. The total immersion aspect of the summer program may be important for the latter group but unnecessarily burdensome for the former group. In suggesting these considerations, we intimate no view as to their ultimate merit.

36

district court's decision) is that, in the case of any applicant, what can and cannot be accomplished with reasonable remediation is a key element of the admissions decision.  Clearly, this principle is educationally sound.  But the court's action in eliminating the existing remedial courses can legitimately be challenged by plaintiffs as an inappropriate feature of the court's admissions remedy.  We have recognized that there are some tensions in the district court's findings in this regard. In the light of these tensions and the absence of specific consideration of the justification for, or reasonableness of, eliminating these unchallenged courses, we are sufficiently concerned about the district court's exercise of its discretion in this regard to direct the court on remand to reconsider its decision to eliminate these courses.  On remand, the district court should determine if remedial courses are needed to help ensure that students admitted under the new admissions criteria have a realistic chance of achieving academic success.[41]

### iv.  Timing

The United States argues that it may take several years for the summer program to be thoroughly implemented, tested, and evaluated and argues that during the interim, an admissions policy that minimizes any reduction in the number of black

---

[41]  The decision whether to take more evidence on the advisability of reinstating any or all of these courses, either as previously offered or as modified to operate in conjunction with the summer remedial program, is left to the district court.

37

students eligible for regular admission should be installed.[42]

We reject this argument.  The summer program has sufficient promise, on the present state of the record, to allow it "to prove itself in operation," Green v. County Sch. Bd., 391 U.S. 430, 440-41 (1968), should the district court decide to continue on that path.  There is no reason why, however, reconsideration of the district court's decision to eliminate the existing remedial courses cannot be done promptly.  We intimate no view on the outcome of that reconsideration.

### d. Conclusions regarding undergraduate admissions standards

Except as set forth below, we affirm paragraph 2 of the remedial decree, which reads in relevant part as follows:  "The 1995 admissions standards as proposed by the Board for first-time freshmen, effective for the academic year [1996-97], shall be implemented at all universities."  Ayers II, 879 F. Supp. at 1494.  We do not affirm paragraph 2 insofar as it eliminates the remedial courses previously offered at each of the eight universities.  We remand this latter issue for reconsideration in the light of this opinion.  We understand the district court's continuing jurisdiction to encompass the evaluation of the effectiveness of the spring screening and summer remedial

---

[42]  The United States makes a similar argument with respect to the time that it will take to implement changes at the community colleges.  We think that the remedial decree adopted by the district court adequately addresses the community colleges to the extent they can be addressed in this case.  The fact that implementation of this aspect of the remedial decree will take time does not require installation of an interim admissions policy.

program, as a component of the admissions system, in achieving its intended objectives of identifying and admitting those students who are capable, with reasonable remediation, of doing college level work but who fail to qualify for regular admission. Should the district court ultimately conclude that this program (as it may be modified) is unable to any significant degree to achieve its objectives, then the court will need to identify and implement another method for achieving those objectives.

### 3.   Scholarship Policies

#### a.   District court ruling

While the district court found that undergraduate admissions policies in general are vestiges of de jure segregation that continue to have segregative effects, it found that scholarship policies in particular are not.  On remand, plaintiffs challenged the use of ACT cutoff scores for the award of undergraduate academic scholarships at the HWIs, as well as the use of ACT cutoff scores and alumni connection in the award of nonresident fee waivers for out-of-state admittees.[43]  Unlike most other

---

[43]   The nonresident fee waivers for children of nonresident alumni are referred to in the record also as "alumni scholarships."  Our use of the term "scholarships" encompasses academic scholarships as well as nonresident fee waivers, but we use the term "nonresident fee waiver" when referring solely to this type of award.

We note that Mississippi University for Women offers certain scholarships to resident and nonresident children of MUW alumni that require a minimum ACT score of 21 for eligibility.  These scholarships are distinct from the nonresident fee waivers, but plaintiffs challenge the use of the ACT cutoff score and the alumni connection in determining eligibility for these scholarships as well.

forms of financial aid, the scholarships challenged by plaintiffs are generally awarded on the basis of academic achievement, not financial need, and do not require repayment by the recipient. The district court found a significant disparity in the percentage of nonresident fee waivers awarded by race in any given year. Id. at 1433. The evidence indicated similar disparities in the award of academic scholarships. The district court concluded, however, that

> [t]he Board's policy of allowing [nonresident fee waivers] to be based on ACT cutoffs and the use of ACT cutoff scores as the sole criterion for the receipt of academic scholarship monies has not been proven to have linkage with the de jure system, and there is no evidence that these practices currently foster separation of the races such as influencing student choice. Therefore, reformation of these policies cannot be ordered consistent with the law of the case, absent evidence of discriminatory purpose of which the court finds none. The use of ACT scores in awarding scholarships is widespread throughout the United States and generally viewed as educationally sound.

Id. at 1434-35 (footnote omitted). The district court did not make a specific finding with regard to the traceability of the alumni connection requirement for nonresident fee waivers. The remedial decree does not order alteration of any of the challenged scholarship policies.

     b.   Arguments on appeal

Plaintiffs argue that the district court clearly erred in finding that the use of ACT cutoffs in the award of academic scholarships and nonresident fee waivers at the HWIs is not traceable to the dual system and does not have segregative effects. Although the district court's findings and conclusions

with respect to academic scholarships focus specifically on policies that establish an ACT cutoff score as the sole criterion for award, plaintiffs' challenge encompasses all instances in which the HWIs require a minimum ACT score for scholarship eligibility.[44]  Accordingly, plaintiffs have identified on appeal numerous scholarships at various HWIs that are available only to students with certain minimum ACT scores.  Plaintiffs contend that the use of ACT cutoff scores for scholarship eligibility is traceable to the de jure system because under that system ACT cutoff scores were implemented for the purpose of excluding black students from the HWIs.  The segregative effects of this practice, plaintiffs argue, are evident in the racial disparity in scholarship awards.  Because black students receive only a very small proportion of such scholarships, yet are more likely than white students to be in need of financial aid, the policy effectively reduces the number of black students able to attend the HWIs.  Moreover, plaintiffs argue that the record does not

---

[44]  In the Pretrial Order, private plaintiffs listed as a challenged remnant "[t]he policy of using ACT cutoff scores in selecting persons to receive particular scholarships at the undergraduate level at each HWI."  The United States similarly identified this alleged remnant as "[t]he practice of using the ACT in selecting persons to receive scholarships at the undergraduate level."

Significantly, plaintiffs do not challenge any of the scholarship policies at the HBIs and no party argues on appeal that such policies either are traceable to the de jure system or have present segregative effects.  Accordingly, we express no opinion on the scholarship policies at the HBIs or their relevance in reforming scholarship policies to eliminate present segregative effects.  In fashioning the most appropriate remedy, however, the district court may find it relevant to consider all scholarship policies.

41

support the district court's finding that the use of ACT cutoff scores in the award of scholarships is widespread.

Plaintiffs also contend that the district court erred in upholding the practice of limiting nonresident fee waivers to children of an institution's alumni. Plaintiffs maintain that the alumni connection requirement is traceable to the de jure system in that parents of today's students were systematically excluded from the HWIs under the de jure system.

### c. Analysis

Although it is clear from the record that undergraduate scholarship policies were litigated on remand, the district court made virtually no fact findings with regard to specific policy criteria or operation. The parties' original briefing of this issue on appeal was also scant.[45] In response to our request for supplemental briefing, plaintiffs provided a summary of the challenged policies along with the racial breakdown of their distribution for the 1992-93 year (and in one instance, for the 1991-92 year). Defendants have not contested the accuracy of this summary, which is drawn from defendants' answers to interrogatories and from other evidence introduced by defendants. We therefore accept plaintiffs' factual summary. According to that summary, the scholarships alleged to be traceable to de jure segregation and to have present discriminatory effects are as

---

[45] To ensure that we were apprised of all arguments and relevant evidence on appeal, we requested, and the parties supplied, supplemental briefing on the issue of undergraduate scholarships.

42

follows:

| DELTA STATE UNIVERSITY | First-time freshman enrollment 1992-93: 21% black | | | | | | |
|---|---|---|---|---|---|---|---|
| Scholarship Name[46] | Minimum ACT Score | Number of Recipients | | | Dollars Received | | |
| | | Black | White | Total | Black | White | Total |
| Dean's and Presidential | 26 | 2 | 160 | 162 | $1,375 | $131,175 | $132,550 |
| | | 1% black | | | 1% black | | |

| MISSISSIPPI STATE UNIVERSITY | First-time freshman enrollment 1992-93: 16% black | | | | | | |
|---|---|---|---|---|---|---|---|
| Scholarship Name | Minimum ACT Score | Number of Recipients | | | Dollars Received | | |
| | | Black | White | Total | Black | White | Total |
| Entering Freshman ACT 8,000 | 31 | 1 | 294 | 299 | $2,000 | $546,000 | $555,000 |
| Sharp Forestry | 31 | 0 | 3 | 3 | 0 | 7,500 | 7,500 |
| Entering Freshman ACT 5,000 and Schillig | 29 | 5 | 454 | 468 | 16,250 | 596,836 | 626,836 |
| Ramsey & Elaine O'Neal and Hearin-Hess | 28 | 0 | 41 | 41 | 0 | 115,500 | 115,500 |
| Entering Freshmen ACT 4,000, South Central Bell, and Jesse & Lillian Tims | 28 | 5 | 248 | 267 | 7,944 | 239,444 | 261,388 |
| Leadership | 20 | 8 | 71 | 80 | 3,600 | 34,450 | 38,550 |
| John C. Stennis | 24 | 1 | 6 | 8 | 1,000 | 6,000 | 8,000 |
| Alumni | 21 | N/A | N/A | N/A | N/A | N/A | N/A |
| TOTAL | | 20 | 1117 | 1166 | $30,794 | $1,545,730 | $1,612,774 |
| | | 2% black | | | 2% black | | | **MISSISSIPPI UNIVERSITY FOR WOMEN** |

---

[46] Plaintiffs advise in their brief that in some instances data for more than one scholarship with the same ACT cutoff score has been grouped. This reflects the way defendants provided scholarship data in response to interrogatories.

43

| First-time freshman enrollment 1992-93: 21% black | | | | | | |
|---|---|---|---|---|---|---|
| **Scholarship Name** | **Minimum ACT Score** | **Number of Recipients** | | | **Dollars Received** | | |
| | | **Black** | **White** | **Total** | **Black** | **White** | **Total** |
| Centennial and Eudora Welty | 28 | 0 | 26 | 26 | $0 | $142,464 | $142,464 |
| Regional | 21 | 2 | 68 | 70 | 1,200 | 74,400 | 75,600 |
| Alumni | 21 | 2 | 50 | 52 | 600 | 32,540 | 33,140 |
| Academic | 21 | 10 | 208 | 218 | 3,402 | 111,500 | 114,902 |
| Valedictorian | 21 | 0 | 6 | 6 | 0 | 7,075 | 7,075 |
| Salutatorian | 21 | 0 | 6 | 6 | 0 | 4,125 | 4,125 |
| TOTAL | | 14 | 364 | 378 | $5,202 | $372,104 | $377,306 |
| | | 4% black | | | 1% black | | |

| First-time freshman enrollment 1991-92: N/A | | | | | | |
|---|---|---|---|---|---|---|
| **Scholarship Name** | **Minimum ACT Score** | **Number of Recipients** | | | **Dollars Received** | | |
| | | **Black** | **White** | **Total** | **Black** | **White** | **Total** |
| Special Conditions | 21 | 34 | 154 | 188 | $40,820 | $139,163 | $179,983 |
| Academic | 25 | 0 | 79 | 79 | 0 | 130,425 | 130,425 |
| TOTAL | | 34 | 233 | 267 | $40,820 | $269,588 | $310,408 |
| | | 13% black | | | 13% black | | |

| **UNIVERSITY OF MISSISSIPPI** First-time freshman enrollment 1992-93: 7% black | | | | | | |
|---|---|---|---|---|---|---|
| **Scholarship Name** | **Minimum ACT Score** | **Number of Recipients** | | | **Dollars Received** | | |
| | | **Black** | **White** | **Total** | **Black** | **White** | **Total** |
| Children of Nonresident Alumni | 21 | 1 | 305 | 307 | $1,960 | $529,512 | $533,432 |
| Children of Faculty & Staff Post-1977 | 18 | 10 | 106 | 118 | 14,092 | 88,540 | 104,196 |
| Children of Faculty & Staff Pre-1977-78 | 19 | 10 | 104 | 116 | 19,780 | 195,263 | 215,783 |
| Academic | 28 | 6 | 683 | 701 | 14,130 | 1,608,555 | 1,641,805 |
| Academic | 30 | 2 | 27 | 29 | 9,500 | 105,000 | 114,500 |
| Academic | 22 | 9 | 240 | 253 | 11,350 | 244,467 | 258,642 |
| Special Conditions | 22 | 6 | 130 | 140 | 6,810 | 211,550 | 224,240 |

44

| TOTAL | | 44 | 1595 | 1664 | $77,622 | $2,982,887 | $3,092,598 |
|---|---|---|---|---|---|---|---|
| | | 3% black | | | 3% black | | |

| UNIVERSITY OF SOUTHERN MISSISSIPPI First-time freshman enrollment 1992-93: 27% black | | | | | | | |
|---|---|---|---|---|---|---|---|
| Scholarship Name | Minimum ACT Score | Number of Recipients | | | Dollars Received | | |
| | | Black | White | Total | Black | White | Total |
| Presidential, Schillig-Baird, Pulley, Pulley, and Gough | 29 | 0 | 36 | 36 | $0 | $194,043 | $194,043 |
| Academic Excellence | 28 | 7 | 352 | 371 | 8,375 | 773,490 | 816,860 |
| Regional | 25 | 0 | 43 | 47 | 0 | 72,914 | 79,774 |
| Alumni | 21 | 1 | 143 | 146 | 1,960 | 230,333 | 236,213 |
| TOTAL | | 8 | 574 | 600 | $10,335 | $1,270,780 | $1,326,890 |
| | | 1% black | | | 1% black | | |

The district court found that basing scholarship eligibility on ACT cutoff scores is not traceable to the dual system and does not have current segregative effects.  We agree with the principle articulated by the district court that use of an ACT cutoff is not unlawful in all circumstances.  "Rather, its particular use in any circumstance must be examined to consider whether as a component of the policy challenged, the same is traceable to prior de jure segregation."  Ayers II, 879 F. Supp. at 1434.  In light of the facts set out above, however, we conclude that the district court erred in arriving at its findings regarding traceability and segregative effects.[47]

The district court may have applied an erroneous view of

---

[47]  Our conclusion in this regard applies to the use of ACT cutoffs in all challenged scholarships.

traceability. As defendants point out in their supplemental letter brief, a traceable policy is one "rooted in" the prior dual system. See Fordice, 505 U.S. at 730 n.4, 732 n.6, 743. It is only "surviving aspects" of de jure segregation that a state need remedy. See id. at 733. That is not to say, however, that a challenged policy as it exists today must have been in effect during the de jure period in order to be constitutionally problematic. The undergraduate admissions criteria that the district court found to be traceable, for instance, had been modified several times since the de jure era but nonetheless were found to be rooted in the prior system. Similarly, the Supreme Court found Mississippi's scheme of institutional mission classifications to be traceable to de jure segregation even though it was not put in place until several years after termination of official segregation. See id. at 732-33, 739-41. The Court noted that "[t]he institutional mission designations adopted in 1981 have as their antecedents the policies enacted to perpetuate racial separation during the de jure segregated regime." Id. at 739. In United States v. Louisiana, this court implicitly recognized that Louisiana's open admissions policy could be traceable to that state's prior de jure system despite its adoption only after de jure segregation had ended. See 9 F.3d at 1167. Because the district court had not addressed the policy's traceability, we left the issue open for resolution on remand. Id.

In this case, plaintiffs concede that the record does not

contain evidence directly linking the use of ACT cutoffs for scholarship purposes with any time prior to 1980.  Such evidence apparently was not developed because plaintiffs concluded, in our view correctly, that the discriminatory use of ACT cutoffs to exclude black students from the HWIs during the de jure period establishes traceability with respect to all current practices that limit black student access to the HWIs by setting ACT cutoff scores at a level that disproportionately favors white students.  Defendants contend that plaintiffs have failed to prove traceability because they have not produced evidence establishing that the practice of using ACT cutoffs in the award of scholarships was initiated either "(i) during de jure segregation, (ii) as an integral component of de jure segregation, (iii) to continue, perpetuate, or further segregation, or (iv) because of some intentionally segregative policy which formerly existed."[48]  This argument misses the mark.  First, to the extent defendants suggest it is lacking, evidence of discriminatory purpose is required to establish a constitutional violation only for present policies that are not traceable to the prior system; discriminatory purpose is not an element of traceability itself.  Fordice, 505 U.S. at 733 n.8.  Second, this argument ignores the relationship between scholarship awards and grants of admission, an element missing

---

[48]  Upon motion of plaintiffs, the district court placed the burden of proving traceability on plaintiffs.  No party appeals the allocation of burdens of proof.  For purposes of this appeal, we assume without deciding that the district court did not err in this respect.

47

from the district court's analysis as well.

Scholarship decisions are not wholly independent of admissions in the way that most financial aid determinations are. Indeed, the record indicates that at University of Mississippi, Delta State University, and Mississippi University for Women, the application for admission also constitutes the application for scholarships. It is because scholarships are intended to reward exemplary academic achievement, as defendants point out, that scholarship decision criteria overlap more with those for admission than for financial aid. By their nature, scholarships are designed to attract outstanding students to the awarding institution; that scholarships need not be repaid is a powerful incentive for students to both pursue and accept them. As a component of admissions, scholarship policies further the process that ultimately culminates in matriculation. In finding that the use of ACT cutoffs in the scholarship context is not traceable to the de jure system, the district court may have distinguished scholarships too strictly from admissions, although its opinion, which addresses scholarships as a component of admissions, suggests otherwise. See Ayers II, 879 F. Supp. at 1424, 1431-35.

As presented by plaintiffs, the challenged scholarships require students to achieve a certain minimum ACT score to be eligible for the award. Accordingly, a student who has not achieved the requisite ACT score will not be considered, regardless of how impressive his or her grades or other academic achievements might be. This is "constitutionally problematic"

48

for the same reason the Supreme Court found the use of the ACT in admissions to be so.  See Fordice, 505 U.S. at 736 ("Another constitutionally problematic aspect of the State's use of the ACT test scores is its policy of denying automatic admission if an applicant fails to earn the minimum ACT score specified for the particular institution, without also resorting to the applicant's high school grades as an additional factor in predicting college performance.").  Just as there may be students who could do college level work yet might be precluded from enrolling in an institution that maintains ACT cutoffs in admissions, there may be students who have outstanding academic achievement that merits recognition apart from their ACT scores.

It bears emphasis that the use of ACT cutoffs in the award of scholarships raises constitutional suspicion only because of the history of de jure segregation in Mississippi.  The practice of rewarding academic achievement as determined by standardized test scores, even where it results in significant racial disparities in receipt of awards, is not per se unconstitutional. Use of ACT cutoffs does not take place on a clean slate in Mississippi, however.  The alleged practice of basing scholarship eligibility on minimum ACT scores flows from earlier discriminatory use of ACT cutoffs and therefore triggers further constitutional inquiry, under Fordice, into whether it continues to have segregative effects.

The use of ACT cutoff scores in the award of scholarships restricts black students' access to the HWIs in much the same way

that the use of ACT cutoff scores in a system of differential admissions standards was found to restrict access.  The district court findings and other evidence indicate that scholarships with ACT cutoff scores are disproportionately awarded to white students.  See Ayers II, 879 F. Supp. at 1433.  In addition, the district court found that black applicants to Mississippi's universities are more likely to need financial aid than white applicants.  Id. at 1433-34 n.28.  To the extent that academically accomplished black students are unable to achieve ACT scores that would qualify them for scholarships at the HWIs, they are discouraged from both applying to and matriculating at these institutions.[49]  While the potential segregative effect of the use of ACT cutoffs in determining scholarship eligibility is perhaps somewhat less pronounced than that of the use of ACT cutoffs in admissions, the evidence nevertheless indicates that such potential does exist.

The fact that some HWIs offer scholarships specifically for black applicants does not, as the State argues, alter this conclusion.  The evidence suggests that such scholarships represent an extremely limited proportion of available scholarship monies, and in most instances fall significantly short of the amount of aid offered through generally available scholarships.  The availability of a small number of minority scholarships at the HWIs does not automatically neutralize the

---

[49]  The district court found that black students continue to be significantly underrepresented at most of the HWIs.  Ayers II, 879 F. Supp. at 1469.

50

ongoing discriminatory effects of current scholarship policies rooted in the _de jure_ past.

There is evidence in the record to indicate that the use of ACT cutoffs in the award of scholarships can be practicably eliminated consistent with sound educational practices.  Of course, as we noted with respect to undergraduate admissions policies, we do not hold that reliance on ACT scores for scholarship purposes must be eradicated entirely.  We leave to the district court on remand factfinding with regard to the practicability of reforming current policies consistent with sound educational practices.

Plaintiffs also argue that the district court erred in failing to find that basing eligibility for nonresident fee waivers (and, in the case of Mississippi University for Women, certain scholarships for children of resident and nonresident alumni) on relationship to alumni of Mississippi's HWIs is traceable to the _de jure_ system and has present segregative effects.  We agree that this practice, which the district court found to result in the disproportionate award of such scholarships to white students, has present segregative effects. We are not persuaded, however, that traceability has been established on this record.[50]  Plaintiffs' argument rests upon the exclusion of blacks from the HWIs during the _de jure_ period.

---

[50]  Our conclusion in this regard applies to the alumni connection requirement in the challenged scholarships offered by Mississippi University for Women as well as that in the nonresident fee waivers.

51

This fact, without more, does not establish the traceability of the alumni element of the present nonresident fee waivers.  In effect, plaintiffs seek relief for "present discriminatory effects without addressing whether such consequences flow from policies rooted in the prior system."  Fordice, 505 U.S. at 730 n.4.  The Supreme Court has rejected this position.  Id.  Plaintiffs note in their briefs that this court struck down, as unlawfully discriminating against black applicants to Mississippi universities, a requirement established by the Board shortly after the decision in Brown v. Board of Education, 347 U.S. 483 (1954), that each applicant for admission furnish letters or certificates from alumni attesting to the good moral character of the applicant.  See Meredith v. Fair, 305 F.2d 343, 351 (5th Cir.), cert. denied, 371 U.S. 828 (1962).  In our view (assuming that plaintiffs intend this as an alternative basis for traceability), on this record the alumni certificate requirement for admission has no connection, historical or otherwise, with the nonresident fee waivers presently awarded to the children of nonresident alumni except for the fact that both involve some "alumni connection."  Any such argument urges us to a level of generality that is beyond the traceability contemplated by Fordice.

     d.   Conclusions regarding scholarship policies

We reverse the district court's finding that the use of ACT cutoff scores as a criterion for the award of scholarships at the HWIs is not traceable to the de jure system and does not

currently foster segregation. We remand for determination of the practicability and educational soundness of reforming this aspect of the undergraduate scholarship policies at the HWIs and the implementation, if necessary, of appropriate remedial relief.

B.    Enhancement of Historically Black Institutions

    1.    Background Facts

Plaintiffs contend that several policies related to funding and programs at the HBIs are remnants of the de jure system that must be remedied by relief more expansive than that ordered by the district court. Plaintiffs' arguments in this regard encompass four interrelated areas: new academic programs, land grant programs, program duplication, and funding. According to plaintiffs, these aspects of higher education affect student choice, and existing policies must be remedied in order to enable the HBIs to attract students of all races.[51]

In addition, private plaintiffs appear to advocate enhancement of the HBIs in order to rectify the detrimental effects of past de jure segregation, without regard to present policies and practices. This position is at odds with standards established in Fordice. The Supreme Court expressly rejected the proposition that the State's duty to dismantle its prior de jure system requires elimination of all continuing discriminatory

---

[51]    The district court found that "[b]lacks are now attending the HWIs as a group in statistical parity with their representation in the qualified pool." Ayers II, 879 F. Supp. at 1486.

53

effects: "To the extent we understand private petitioners to urge us to focus on present discriminatory effects without addressing whether such consequences flow from policies rooted in the prior system, we reject this position." Fordice, 505 U.S. at 730 n.4. Likewise,

> [i]f we understand private petitioners to press us to order the upgrading of Jackson State, Alcorn State, and Mississippi Valley State solely so that they may be publicly financed, exclusively black enclaves by private choice, we reject that request. The State provides these facilities for all its citizens and it has not met its burden under Brown to take affirmative steps to dismantle its prior de jure system when it perpetuates a separate, but 'more equal' one.

Id. at 743.

The appropriate inquiry under Fordice, then, is whether changes in resource allocation are necessary to dismantle fully present policies and practices rooted in the prior system that serve to maintain the racial identifiability of the universities and that can practicably be eliminated without eroding sound educational policies. See id. Current policies and practices (as distinguished from lingering disparities in institutional development per se) implicate the Fourteenth Amendment only insofar as they are traceable to the prior system and continue to have segregative effects, either by influencing student choice or otherwise.

2.    New Academic Programs

a.    District court ruling

The programmatic expansions of Jackson State and Alcorn State ordered by the district court respond to its findings

54

concerning deliberate efforts by the State of Mississippi to restrict the educational opportunities of its black citizens, as well as the traceability of current mission assignments to these historical antecedents.  See Ayers II, 879 F. Supp. at 1437-41, 1477, 1483-86.  As the district court found, after establishment of Alcorn State in 1871 and continuing through roughly the first half of this century, the prevailing notion concerning the education of blacks was that blacks could benefit only from agricultural or mechanical training, rather than a liberal education as provided to whites.  Id. at 1437-38.  Alcorn State was originally designated as an agricultural college for Mississippi's black youth, and Jackson State and Mississippi Valley State, founded in 1940 and 1950, respectively, were established primarily to train black teachers.  Ayers I, 674 F. Supp. at 1527-28.  During the years 1945 through 1970, when both the HWIs and the HBIs experienced considerable growth in enrollment, the bulk of the State's higher education resources, particularly programmatic allocations, went to University of Mississippi, University of Southern Mississippi, and Mississippi State University, the three leading white universities.  Ayers II, 879 F. Supp. at 1439.

The district court found that the mission designations adopted by the Board in 1981 -- and in place throughout both the 1987 and 1994 trials -- effectively fixed the scope of programmatic offerings that were in place at each university during the de jure period.  Id. at 1438-39.  The Board designated

University of Mississippi, University of Southern Mississippi, and Mississippi State University "comprehensive" universities, thereby indicating that these institutions would continue to offer a greater number and a higher level of degree programs than all other institutions. Based on its location in the city of Jackson, Jackson State was designated an "urban" university with the mission of serving the urban community. The Board designated Alcorn State, Delta State, Mississippi University for Women, and Mississippi Valley State "regional" universities, signifying a programmatic range limited to undergraduate instruction. Id. at 1438.

> In Fordice, the Supreme Court found that
>
> when combined with the differential admission practices and unnecessary program duplication, it is likely that the mission designations interfere with student choice and tend to perpetuate the segregated system. On remand, the court should inquire whether it would be practicable and consistent with sound educational practices to eliminate any such discriminatory effects of the State's present policy of mission assignments.

505 U.S. at 741. The district court indeed found that "[p]olicies and practices governing the missions of the institutions of higher learning are traceable to de jure segregation and continue to foster separation of the races." Ayers II, 879 F. Supp. at 1477. The remedial decree, however, does not order any alteration of the mission designations. See id. at 1483.[52] No party appeals retention of the mission

___

[52]  The Board apparently has upgraded the mission of Jackson State to an "enhanced" urban designation. Ayers II, 879 F. Supp. at 1483.

56

designations per se.

The remedial decree does order some augmentation of the programs offered at Jackson State and Alcorn State.[53] The district court found that the policies and practices of de jure segregation impeded the development of both universities. Id. at 1466, 1484. At Jackson State, the court found that the dearth of professional programs hindered potential other-race enrollment at the main campus. Id. at 1485. Although the court found that the record supported neither the educational soundness of transferring programs to Jackson State nor the desegregative potential of institutional affiliation with the University of Mississippi Medical Center, it found that the addition of other unique, high demand programs did have potential to desegregate the institution. See id. at 1485-86. The district court accordingly ordered implementation at Jackson State of programs in allied health, social work (Ph.D), urban planning (Masters/Ph.D), and business (DBA).[54] Id. at 1494. In addition, the remedial decree directs the Board to undertake an institutional study

> with the express purpose of determining the nature and
> direction of those programs slated to be implemented,
> as well as further programmatic expansion at JSU, to
> best achieve the urban emphasis of its mission.
> Included in this study will be an evaluation of the

---

[53] The remedial decree orders the State to provide the funding for all measures ordered by the decree. Ayers II, 879 F. Supp. at 1496.

[54] The doctoral program in business is to be implemented at Jackson State "when existing business programs are accredited." Ayers II, 879 F. Supp. at 1494.

57

> feasibility and educational soundness of establishing
> an engineering school, a public law school, and a five-
> year pharmacy program under the direction and control
> of JSU.

Id. at 1495.

With respect to Alcorn State, the district court found that certain proposed programmatic enhancements promised realistically to increase other-race presence and were educationally sound. Accordingly, the district court ordered implementation of an MBA program at Alcorn's Natchez Center, to be funded specially by the State along with related capital improvements. The court also ordered the State to provide the Small Farm Development Center at Alcorn with annual research and extension funds to match similar federal funds appropriated to Alcorn, up to an aggregate of $4 million each year.[55]  Id. at 1495.

The district court did not order any programmatic enhancements at Mississippi Valley State. Although the court found that Mississippi Valley State's proximity to Delta State tended to perpetuate segregation,[56] it stated that

> [o]n the record . . . the court cannot find that
> institutional enhancement of MVSU will eliminate the
> vestiges of segregation that have contributed to MVSU's
> status as essentially a one-race institution. Evidence
> does not persuade the court that merely adding programs
> and increasing budgets will desegregate a HBI. That is
> not to say, however, that changes made over time at the

---

[55]  The Small Farm Development Center falls within the land grant function of Alcorn State. While we note this component of the remedial decree here, we discuss the court's ruling with respect to land grant programs separately below.

[56]  The district court's findings with respect to the segregative effects of proximate and nonproximate institutions are set forth in our discussion of program duplication infra.

university consistent with its mission as a baccalaureate institution cannot promote diversity at the campus. The court cannot find that institutional or programmatic enhancement of MVSU is justified as educationally sound for desegregation purposes based on this record.

Id. at 1491. The court also found, however, that while

there is evidence to suggest that transferring programs to MVSU may not be educationally sound, there is likewise evidence that measures can be taken which, over time, offer a potential of desegregating MVSU. As one of the State's own witnesses testified, evidence suggests that HBIs in other formally de jure segregated states have been successful in integrating their student bodies through a variety of approaches and measures.

Id. The sole portion of the remedial decree that pertains specifically to Mississippi Valley State is the following section concerning the proposed merger with Delta State:

12. If, after further study of any available educationally sound alternatives, the Board determines that desegregation in the Mississippi Delta can be attained only through its DSU/MVSU consolidation proposal and that abandoning the financial investment presently in place at the [MVSU] campus and constructing replacement facilities at the [DSU] campus present a practical course of action, it shall substantiate that conclusion no later than July 1, 1996 to the Monitoring Committee.

Id. at 1495.

Finally, the district court determined that practices concerning accreditation of academic programs at the HBIs did not warrant remedial relief.[57] The court found that while none of the HBIs was accredited as of 1961, each has now attained

---

[57] Private plaintiffs and the United States challenged "[t]he practice of failing to take the necessary steps (including the provision[] of required facilities) to secure the accreditation of programs at the HBIs." Ayers II, 879 F. Supp. at 1497, 1501.

59

accreditation and "[s]ince 1980, with the possible exception of JSU, the overall percentage of programs accredited at all universities has increased substantially." Id. at 1441. The court found that the State's "inattentiveness" to the HBIs during the de jure period with regard to program and institutional accreditation negatively affected institutional prestige, but that "there is no evidence that the State's previous failings in this regard persist into the present day." Id. at 1445. The court stated that little evidence had been presented on the present status of the accreditation issue. Id.

b.    Arguments on appeal

Plaintiffs argue that the district court erred as a matter of law by failing to order any new programs at Mississippi Valley State and only two new programs at Alcorn State. While plaintiffs do not challenge the district court's rejection of the Board's proposal to merge Mississippi Valley State and Delta State, they contend that the record does not support the court's conclusion that programmatic enhancement of Mississippi Valley State will not help to desegregate the Delta. Plaintiffs argue with respect to Alcorn State that further relief is warranted given the Natchez location of the MBA program, which plaintiffs contend will not help to desegregate the main campus,[58] and the State's prior commitment to funding the Small Farm Development Center. The United States specifically asks this court to remand

_____

[58]    The Natchez Center is located approximately 40 miles from Alcorn's main campus. Ayers I, 674 F. Supp. at 1542.

60

with instructions to order the Board to study and report to the Monitoring Committee on actions that could be taken to enable Mississippi Valley State and Alcorn State to attract students of all races, including improvement of existing programs and the addition of unique, high demand programs.[59]  Plaintiffs do not appeal the district court's order as it pertains to programmatic enhancement of Jackson State.[60]

Private plaintiffs also argue that the district court clearly erred in finding that problems with accreditation of programs at the HBIs do not persist to the present.

Defendants contend that the traceability of mission assignments does not warrant institutional enhancement of the HBIs beyond that ordered by the district court, and that the record does not support general enhancement of these institutions as a desegregation tool.

### c.  Analysis

The issue of programmatic enhancement directly implicates policies governing institutional missions, which the district court found to be traceable to the de jure system and to have current segregative effects.  Fordice mandates that the State

---

[59]  The United States in its brief argues that the district court should have ordered additional funding at the HBIs to, among other things, "improve the quality of existing programs." U.S. Br. at 44.  Except for specific issues (such as, for example, program accreditation and faculty salaries) that we have addressed elsewhere in this opinion, the general issue of program quality is not briefed and we therefore do not address it.

[60]  The parties' arguments concerning the land grant programs in particular are discussed in Part III.B.3 infra.

eliminate such vestiges of the prior system to the extent practicable and consistent with sound educational practices. This is a substantial burden; accordingly, to the extent that the record indicates that the State could practically take steps to desegregate that do not run afoul of sound educational practices, the State has a duty to do so and the remedial decree should so reflect.

Our review of the record leads us to conclude that the district court's finding that "merely adding programs and increasing budgets" is not likely to desegregate an HBI, Ayers II, 879 F. Supp. at 1491, is supported by the evidence and is not clearly erroneous. There was testimony that the Louisiana experience with implementation of a consent decree to desegregate public institutions of higher education was not successful in attracting white students to historically black universities, despite investment of over $75 million in new academic programs at those universities. The evidence showed that there was no correlation between dollars expended on new program implementation and white enrollment in those programs. During the six years (1981-87) that the Louisiana consent decree was in effect, white enrollment in predominantly black universities increased by just 1.1%, while black enrollment in predominantly white universities decreased from 56% to 47% of black enrollment in the system as a whole.[61]

---

[61] Cf. United States v. Louisiana, 692 F. Supp. 642, 645 (E.D. La. 1988) ("Despite the slight increase in black enrollment statewide, the racial polarization has increased as a whole

62

The district court's findings do indicate, however, that steps can be taken that might serve to desegregate Mississippi Valley State, although determining what those steps might be requires further study. In its discussion of Mississippi Valley State in the context of the proposed merger with Delta State, the court stated that "evidence suggests that HBIs in other formally de jure segregated states have been successful in integrating their student bodies through a variety of approaches and measures." Id. Indeed, evidence presented by the United States and defendants indicates that well-planned programs that respond to the particular needs and interests of local populations can help to desegregate historically black institutions. Witnesses for both parties testified that programs not duplicated at proximate institutions, targeted to local demands, and in many cases offered through alternative delivery systems (such as off-campus, evening, or weekend programs) have had success in attracting white students to historically black institutions in other states.

Consistent with its findings regarding the potential to desegregate Mississippi Valley State, the district court stated

during the term of the consent decree: the predominantly white institutions had about 2000 fewer black students in 1987 than in 1981, while the predominantly black institutions showed only a negligible increase in white enrollment from around 0.3% in 1981 to around 1.1% in 1987."). According to the three-judge court that reviewed the special master's final report in the Louisiana case, "[t]he experience of the consent decree confirms that enhancement of [predominantly black institutions] without more simply makes [predominantly black institutions] more attractive to black students, without attracting white students." United States v. Louisiana, 718 F. Supp. 499, 508 (E.D. La. 1989).

in its opinion that it "will direct the Board to explore these areas more thoroughly to determine what measures have had success in other systems of higher education, if any, which also have a reasonable chance of success in desegregating MVSU." Id. at 1492. This directive, however, was not incorporated into the remedial decree. This may be explained by the fact that the future of Mississippi Valley State was uncertain at the time the district court drafted its opinion. Under the remedial decree, merger with DSU remained a possibility that depended upon the Board's study of options for desegregating the Delta region. We cannot conclude that the district court abused its discretion in failing to order the above relief when the very existence of Mississippi Valley State as an independent institution remained in question. At present, however, all parties apparently have concluded that merger of Mississippi Valley State with Delta State is neither required nor desired.[62] On remand, the district court must clarify the status of the merger proposal. If the district court confirms that merger will no longer be pursued, then the district court must address the continuing segregative effects of Mississippi Valley State's limited mission and incorporate into its remedial decree a provision requiring the Board, on a continuing basis, to study and report to the

---

[62] Counsel for defendants stated at oral argument before this court that defendants had publicly announced that they were no longer pursuing merger. In its brief, the United States expressed unqualified support for the district court's rejection of the merger proposal. Private plaintiffs' argument for enhancement of Mississippi Valley State likewise indicates their opposition to merger.

Monitoring Committee on new academic programs that have a reasonable chance of increasing other-race presence at Mississippi Valley State.

Plaintiffs' contention that the district court was required to order further relief at Alcorn State is less persuasive, at least as it addresses the short term. We are not persuaded that further relief is warranted on the basis of the MBA program's location away from the main campus at Natchez; plaintiffs' own expert testified that off-campus offerings are among those initiatives that have been successful at attracting other-race students to historically black institutions. Nor are we persuaded that the State's prior commitment to funding the Small Farm Development Center necessitates the order of additional relief; this fact does not implicate the <u>Fordice</u> standard for remedial relief. The record does suggest, however, that measures that have been successful in desegregating historically black institutions in other states may have potential over the longer term to be effective also at Alcorn State. We see no reason, in light of the traceability of the HBIs' limited missions and of their continuing racial identifiability, to limit continuing study of new academic programs with desegregative potential to Jackson State. The district court should have incorporated such relief with respect to Alcorn State into the remedial decree.

We recognize that substantial evidence indicates that efforts to desegregate an HBI can succeed only insofar as they tap into locale-specific demands. Any such inherent limitation

65

on the potential to achieve desegregation in the university context may underlie some of the district court's findings and suggests that implementation of unique, high demand programs that can reasonably be expected to attract white students to HBIs may ultimately turn out to be quite modest.

Private plaintiffs' argument that the district court clearly erred in finding no present neglect by the State with respect to accreditation of programs at the HBIs is unavailing. The district court's finding of substantial increases in the percentage of programs accredited at all universities is supported by the record, and private plaintiffs do not identify any present policy that currently hinders accreditation of programs at the HBIs.

Private plaintiffs' accreditation concerns are relevant, however, to one aspect of the district court's remedial decree. The doctoral program in business that the court ordered at Jackson State is not to be implemented until existing business programs are accredited, and the record indicates that despite the Board's goal of achieving accreditation for these programs, set forth as early as 1974 in the Board's plan of compliance with Title VI, it has not yet been accomplished. The record is not clear as to the reasons that these programs are not yet accredited. In the interest of ensuring that the district court's order concerning the doctoral program in business be given meaningful effect, the district court on remand should inquire into present efforts to achieve accreditation of Jackson

State's business programs and order any relief that is appropriate with respect to the Board.

        d.    <u>Conclusions regarding new academic programs</u>

We affirm the portions of the remedial decree addressing the addition of new academic programs at Jackson State and Alcorn State. We direct the district court on remand to clarify the status of the Board's proposal to merge Mississippi Valley State with Delta State. If the district court confirms that merger will no longer be pursued, it should incorporate into the remedial decree a provision directing the Board to study and to report to the Monitoring Committee on whether there are any new academic programs, including programs which have had success in desegregating other systems of higher education, that may have a reasonable chance of success in desegregating Mississippi Valley State. We further remand for incorporation into the remedial decree of a similar provision directed to Alcorn State covering new academic and land grant programs. On the issue of accreditation, the district court should determine the status of current efforts to achieve accreditation of existing business programs at Jackson State and order appropriate relief, if necessary, to ensure that the Board is taking steps commensurate with its role in this accreditation process.

    3.    <u>Land Grant Programs</u>

        a.    <u>District court ruling</u>

Mississippi State University and Alcorn State University are

Mississippi's two public land grant institutions.[63]  As found by the district court, the traditional elements of the land grant function consist of residential instruction, agricultural research (including an experiment station), and an extension service.[64]  Ayers II, 879 F. Supp. at 1464.  The district court found that during the de jure period the State consistently directed federal and state land grant funds toward Mississippi State University rather than Alcorn State.  Id. at 1464-65.  Specifically, Mississippi directed all federal funding for agricultural research under the Hatch Act, 7 U.S.C. §§ 361a-361i, and all federal funding for extension services to farmers under the Smith-Lever Act, 7 U.S.C. §§ 341-349, to Mississippi State,[65] while Alcorn State received federal funding only under an 1890 federal statute providing funds for black land grant colleges.

---

[63]  "A land grant institution is defined as a college university [sic] entitled to financial and programmatic support from the federal government pursuant to a series of statutes originating with the Morrill Acts enacted by Congress in 1862 and 1890."  Ayers I, 674 F. Supp. at 1543.  The Morrill Act of 1862 and subsequent statutes "defined the land grant college to be an institution that provides instruction in agriculture and mechanical arts, research in agriculture through the experimental stations, and extension of knowledge to farmers through cooperative extension programs."  Id.

[64]  Cooperative extension is a joint effort of the federal government, land grant institutions, and county governments to transfer knowledge to farmers and assist in the development of farm operations.  Ayers I, 674 F. Supp. at 1545.  Cooperative extension originated with the Smith-Lever Act of 1914, 7 U.S.C. §§ 341-349, and is jointly financed by federal, state, and county governments.  Ayers I, 674 F. Supp. at 1545.

[65]  Although the district court made no specific finding in this regard, the evidence indicates that matching state funds were directed to Mississippi State along with the Hatch and Smith-Lever federal appropriations.

Ayers II, 879 F. Supp. at 1464.  As a result, Mississippi State enjoys land grant activities of much greater size and breadth than Alcorn State.  Id. at 1466.  The district court found that "[o]peration and maintenance of two racially identifiable land grant programs are traceable to de jure segregation and have segregative effects."  Id. at 1477.

The court made findings with respect to each of the traditional land grant functions.  The court found that the quality of residential instruction is directly and positively affected by agricultural research conducted on the campus of a land grant institution, which is more extensive at Mississippi State than at Alcorn State due to Mississippi State's broader research mission.  Id. at 1464, 1466.  Turning to agricultural research, the court found:

> With little or no exception, federal Hatch Act dollars are administered in every state by a single institution.  In this time of fewer and fewer persons entering the field of agriculture, but the system nevertheless effectively feeding more and more people, it would be inefficient and, thus, educationally unsound to administer two separate agricultural research programs in the state.  To diffuse the program would create two separate administrative entities, difficulties in communication among the participating scientists, and inefficient duplication.

Id. at 1465.

Similarly, the court found that it would be unsound to administer federal funds for cooperative extension work through two independent cooperative extension programs:

> The general rule of practice is that Smith-Lever funds are administered by only one university in each state. . . . To duplicate administrative processes and procedures as it relates to the delivery of extension

programming is unsound because the short duration of
extension educational programs makes program
coordination difficult from year to year.

Id. at 1465-66.

Although the court found that "the operation of two racially
identifiable land grant institutions might continue to have some
segregative effects that would be minuscule because of the small
number of students now majoring in agriculture," id. at 1484, it
concluded that "[t]he current allocation of agricultural
education programs is educationally sound and there exists no
practical alternative to the current method of providing research
and extension services."  Id. at 1466.  With the exception of a
special funding allocation for the Small Farm Development Center
at Alcorn State, the remedial decree did not mandate any changes
in current land grant policies or practices.  See id. at 1494-96.

b.    Arguments on appeal

The United States argues that "the court erred as a matter
of law when it failed to evaluate alternative proposals for
changes in the allocation of land grant programs short of
dividing the land grant programs equally between the 2
institutions."  U.S. Br. at 47.  The United States further
contends that to the extent the district court's conclusion that
there are no practical alternatives to the current method of
providing research and extension services "is a finding that
there are no educationally sound alternatives to the present
allocation of programs, that finding is clearly erroneous."  Id.
Private plaintiffs advance similar arguments.  Both the United

70

States and private plaintiffs cite evidence that there are unmet needs in Mississippi for new land grant programs, such as water quality, that could be met at Alcorn State.

Defendants argue that the district court correctly found that any segregative effects associated with the operation of two racially identifiable land grant institutions could not be remedied consistent with sound educational practices. Defendants further contend that the addition of agricultural programs at Alcorn State will not contribute to desegregation.

c.    Analysis

The district court's finding that it would be impractical and educationally unsound to alter the current method of providing research and extension services is well supported by expert testimony in the record. As the district court found, the primary source of federal funds for agricultural research is the Hatch Act, and for cooperative extension funds the Smith-Lever Act. Ayers II, 879 F. Supp. at 1464. Substantial evidence indicates that federal (and matching state) funds appropriated through these acts typically are administered by a single institution in each state and that it would be unsound to administer in Mississippi either two separate research programs with Hatch funds or two separate extension programs with Smith-Lever funds.

Contrary to the suggestion of plaintiffs, the district court opinion does not limit its consideration of changes in the allocation of research and extension funds to "equally" dividing

71

such funds between Mississippi State and Alcorn State.  While the court recognized that it would be inappropriate to break up the academic and research facilities at Mississippi State and Alcorn State and divide them "equally" between educational institutions solely on the basis of Alcorn State's heretofore restricted development, see id. at 1466, this statement reflects a legal standard rather than a finding drawn from the evidence on practicability or educational soundness.  The evidence led the district court to conclude more generally that "[t]he current allocation of agricultural education programs is educationally sound and there exists no practical alternative to the current method of providing research and extension services."  Id.[66] Plaintiffs' argument that the district court should have considered alternatives other than an "equal" division of land grant programs accordingly is without merit.

We read the district court's conclusion that it would be impractical and educationally unsound to change the current practice of administering research and extension services primarily through Mississippi State to be limited to research and extension services funded through the Hatch and Smith-Lever Acts, as those statutes are now configured.  Significantly, we do not read the district court opinion to preclude future implementation of land grant programs at Alcorn State.  Instead, the district

---

[66]  The district court similarly stated that "[t]he evidence preponderates toward the conclusion that dividing the roles within the extension arena between two universities rather than as it is currently conducted is not an educationally sound alternative."  Ayers II, 879 F. Supp. at 1484.

72

court's implicit decision not to order implementation at this time at Alcorn State of a program in water quality or any other land grant program offered by plaintiffs reflects the lack of sufficient definition of any of these programs in this record. The addition to the remedial decree, see Part III.B.2.d supra, of a provision directing the Board, on a continuing basis, to study and to report to the Monitoring Committee on programs that have a reasonable chance of increasing other-race presence at Alcorn State encompasses land grant programs as well as new academic programs and permits further study of the programs proposed by plaintiffs.

### d. Conclusions regarding land grant programs

We affirm the district court's ruling as it concerns land grant functions at Mississippi State and Alcorn State.

### 4. Duplication of Programs

### a. Fordice

Program duplication was one of the four remnants of the de jure system identified by the Supreme Court in Fordice. 505 U.S. at 738. Following the 1987 trial, the district court found significant duplication of programs at the HBIs by the HWIs, Ayers I, 674 F. Supp. at 1541, but concluded that "there is no proof" that such duplication "is directly associated with the racial identifiability of institutions," and that "there is no proof that the elimination of unnecessary program duplication would be justifiable from an educational standpoint or that its elimination would have a substantial effect on student choice."

73

Id. at 1561.  The Supreme Court stated that "[i]t can hardly be denied that such duplication was part and parcel of the prior dual system of higher education -- the whole notion of 'separate but equal' required duplicative programs in two sets of schools -- and that the present unnecessary duplication is a continuation of that practice."  Fordice, 505 U.S. at 738.  The Court emphasized that the State bears the burden of proving that present-day program duplication is not constitutionally defective and held that the district court had improperly shifted the burden to plaintiffs.  Id.  The Court indicated that, on remand, the district court should "consider the combined effects of unnecessary program duplication with other policies, such as differential admissions standards, in evaluating whether the State had met its duty to dismantle its prior de jure segregated system."  Id. at 739.

   b.   District court ruling

The alleged remnant presented by plaintiffs to the district court on remand was "[t]he policy and practice of unnecessarily duplicating HBIs' programs and course offerings at HWIs."  Ayers II, 879 F. Supp. at 1498, 1502.  The district court defined "unnecessary duplication" as "'those instances where two or more institutions offer the same nonessential or noncore program.'"  Id. at 1441 (quoting Ayers I, 674 F. Supp. at 1540).  "'Under this definition, all duplication at the bachelors level of nonbasic liberal arts and sciences course work and all duplication at the masters level and above are considered to be

74

unnecessary.'" Id.

The district court found that 40% of the noncore bachelors programs offered at one or more of the three HBIs are unnecessarily duplicated at one or more of the five HWIs; 83% of the masters programs offered at one or more of the HBIs are unnecessarily duplicated at one or more of the five HWIs; 60% of the specialist programs offered at one or more of the HBIs are unnecessarily duplicated at one or more of the five HWIs; and 25% of the doctoral programs offered at one or more of the HBIs are unnecessarily duplicated at one or more of the five HWIs. Id. at 1443. As a group, the HWIs have significantly more high demand, noncore programs that are not duplicated anywhere else in the system as compared with the HBIs as a group. Id. at 1442.

Analyzing program duplication in general, the district court found that the joint operation of duplicative offerings between racially identifiable institutions and differential admissions standards "raises a serious inference that this duplication continues to promote segregation." Id. at 1445. The court drew a distinction, however, between proximate and nonproximate institutions in making more specific findings on the question of segregative effect. The court concluded that only program duplication between proximate, racially identifiable institutions was traceable to de jure segregation and had segregative effects. Id. at 1477, 1486.

The court addressed two instances of program duplication between proximate, racially identifiable institutions. First,

75

in its remedial decree, the district court ordered the Board to "take whatever remaining steps are necessary, if any, to vest complete institutional control in JSU over the facility formerly known as the Universities Center in JSU." Id. at 1495. The Universities Center, located in Jackson, consisted of extension programs operated by various HWIs. Ayers I, 674 F. Supp. at 1542. In 1972 the Board voted to assign management responsibilities for the Universities Center to Mississippi State, the University of Mississippi, and Jackson State. Id. At the trials in 1987 and 1994, plaintiffs identified continued operation of these extension programs in close proximity with Jackson State as a vestige of the de jure system. The district court's order eliminates whatever competition for enrollment the Universities Center fostered with respect to Jackson State.

Second, the court considered program duplication between Mississippi Valley State and Delta State, which are proximate, racially identifiable institutions in the Delta. The district court found that

> [b]ecause of the proximity of these institutions (approximately 35 miles apart) and the similar scope of their missions, (liberal arts undergraduate institutions) [sic] location, costs and program offerings would not appear to have a significant impact on student choice. Rather, lower admissions standards at MVSU appear more likely to attract black students of the Delta region, since as a class black students score lower on the standardized tests used for admission to universities. In light of differing admissions standards, it is clear that program duplication between these two universities does foster segregation.

Ayers II, 879 F. Supp. at 1486. The district court noted that merger of Mississippi Valley State and Delta State would

76

eliminate segregative duplication, id. at 1486, 1489, but rejected the Board's merger proposal for a number of other reasons. See id. at 1491-92. In so doing, the court indicated that measures "less drastic" than merger should be considered. Id. at 1492. In its conclusions of law, the district court stated that "the Board must study program duplication between DSU and MVSU to determine whether any segregative duplication may be eliminated consistent with sound educational practices." Id. at 1494. Neither this directive nor any other remedy pertaining to decreasing program duplication with respect to Mississippi Valley State, however, was incorporated into the remedial decree.

Turning to program duplication between nonproximate institutions, the district court found that "it has not been established that program duplication between non-proximate racially identifiable universities significantly fosters segregation." Id. at 1486. The court found that factors affecting student choice included location, academic reputation, and prestige, none of which is implicated by program duplication. Id. Noting that admissions standards help to shape public perceptions of an institution, the court found that "[t]he consistently lower admissions standards in effect at the HBIs have perpetuated the perception that these institutions are inferior. Accordingly, the likelihood of significant desegregation of HBIs is small and confined to those students who are academically underprepared." Id. The court concluded that absent differences in "prestige or public image," unnecessary

duplication "has little to do with student choice." Id. Program duplication is most likely to influence students who are not place-bound and who have the greatest flexibility in choosing an institution. Id.[67]

The court concluded that "[s]ystem-wide admissions standards, coupled with the financial and programmatic enhancements of JSU and ASU, realistically promise to obviate or lessen whatever segregative effects are potentially harbored by the duplication between racially identifiable non-proximate institutions." Id. In addition, the court found that the Board's existing process for reviewing programs is an educationally sound method of managing duplication in the system. Id. Under this process, Board staff consults with university officials whenever a program's enrollment or graduation rates drop below a certain level predetermined by the Board. The university is then given an opportunity to justify continuation of the program despite its deficiencies. Id. at 1443.

Although the court indicated that uniform admissions, programmatic enhancements, and the Board's program review procedures would adequately mitigate any potential segregative effects of program duplication between nonproximate institutions, it ordered the Board to study program duplication with respect to

---

[67] Elsewhere, the district court found that operation of Alcorn State and Mississippi State, which are nonproximate, racially identifiable, land grant institutions, "might continue to have some segregative effects that would be minuscule because of the small number of students now majoring in agriculture." Ayers II, 879 F. Supp. at 1484.

Jackson State.  The Board is to undertake this as part of a general study:

> 4.  The Board shall undertake an on-site institutional study of JSU to determine the relative strengths and weaknesses of its existing programs as soon as is practicable. . . . The nature and extent of duplication with other institutions in the system will be addressed in this study in the context of determining whether meaningful programmatic uniqueness may be gained which would bring about significant white enrollment through elimination and/or transfer of existing programs at other institutions and the feasibility/educational soundness of such elimination and/or transfer.

Id. at 1494-95.

### c.  Arguments on appeal

The United States argues that the district court erred in failing to order the Board "to undertake a system-wide effort to reduce program duplication and to increase the numbers of unique high demand offerings at the [HBIs]."  U.S. Br. at 47-48.  The United States's argument on this issue continues, in its entirety, as follows:

> The court's finding that duplication between nonproximate institutions does not cause segregation contains no citations or references to record evidence, and appears to be based upon its findings that other factors, such as location, affect student choice, rather than any evidence that duplication does not affect choice.  Again, the court impermissibly placed the burden of proof on the plaintiffs, rather than on the defendants.  And its finding that the Board's existing program review process is adequate to eliminate any segregative effect of duplication, is clearly erroneous, since that process is not triggered by the existence of duplication or the need to promote desegregation.

Id. at 48 (citations omitted).  Private plaintiffs do not raise the issue of program duplication on appeal.

79

d.   Analysis

No party contests the district court's finding that program duplication between proximate racially identifiable institutions is traceable to de jure segregation and continues to have segregative effects.  We therefore accept this finding as supported by the record and conclude that the United States's argument as it applies to Mississippi Valley State is well taken. The district court itself stated that it would order a study of program duplication between Mississippi Valley State and Delta State, see Ayers II, 879 F. Supp. at 1494, yet failed to incorporate any such provision into the remedial decree.  Again, the omission may have been occasioned by the continuing possibility that Mississippi Valley State would be merged with Delta State.  See Part III.B.2.c supra.  We cannot conclude that the district court abused its discretion in failing to order a study of program duplication at Mississippi Valley State when the continued existence of Mississippi Valley State remained in question.  However, upon conclusion of the inquiry we have ordered above, if the district court confirms that merger will no longer be pursued, then the district court must incorporate into its remedial decree a provision requiring the Board to study and report to the Monitoring Committee on unnecessary program duplication between Mississippi Valley State and Delta State.[68]

---

[68]   As we noted in our discussion of new academic programs, Part III.B.2.b supra, the specific relief requested by the United States on appeal with respect to enhancement of the HBIs is an order requiring the Board to study and report to the Monitoring Committee on actions that could make the HBIs more attractive to

The United States's argument as it applies to nonproximate institutions, on the other hand, is not briefed sufficiently for this court to review this aspect of the district court's ruling for error. Cf. Cinel v. Connick, 15 F.3d 1338, 1345 (5th Cir.), cert. denied, 513 U.S. 868 (1994)("A party who inadequately briefs an issue is considered to have abandoned the claim."). It is of no consequence that the district court did not cite to the record in the portion of its opinion addressing the potential segregative effects of program duplication in nonproximate institutions. While citations to the record are helpful, and we commend the district court for its abundant documentation of the record throughout its opinion as a whole, the district court is not required to provide them. Significantly, the United States does not contend that the court's finding of no segregative effect in the context of nonproximate institutions is clearly erroneous.

The United States argues, rather, that the court impermissibly shifted the burden of proof on this issue to the plaintiffs. While the court's language might suggest imposition of the burden of proof on plaintiffs ("it has not been established that program duplication between non-proximate racially identifiable universities significantly fosters segregation"), its reasoning indicates reliance not on the absence of evidence of segregative effect, but rather on the

white students. In light of this request and the structure of the remedial decree, where we have ordered relief in the enhancement area, we have done so in those terms.

81

presence of evidence that factors other than duplicative program offerings have a more significant effect on student choice. We are not persuaded that the court erred in its allocation of the burden of proof.

The United States's argument that the district court's finding "that the Board's existing program review process is adequate to eliminate any segregative effect of duplication is clearly erroneous" mischaracterizes the district court's finding. The court found that "the Board's program review process is an educationally sound way of managing duplication in the system." Ayers II, 879 F. Supp. at 1486. This finding is supported in the record and makes no pretense of disposing of the issue of potential segregative effects. The court went on to conclude that "[s]ystem-wide admissions standards, coupled with the financial and programmatic enhancements of JSU and ASU, realistically promise to obviate or lessen whatever segregative effects are potentially harbored by the duplication between racially identifiable non-proximate institutions." Id. We note that even in light of this conclusion, the district court did order a study of program duplication at Jackson State to determine if elimination or transfer of programs at other institutions might help attract white students to Jackson State. Id. at 1495.

      e.   Conclusions regarding program duplication

We affirm the district court's findings and conclusions on the issue of program duplication. If, on remand, the district

court confirms that the merger of Mississippi Valley State and Delta State will no longer be pursued, the district court should incorporate into its remedial decree a provision requiring the Board to study and to report to the Monitoring Committee on unnecessary program duplication between Mississippi Valley State and Delta State.

   5.   Funding

      a.   District court ruling

Mississippi's eight universities receive state funding through both an annual legislative general support appropriation and line item appropriations.  The universities also rely on self-generated funds, which include private contributions as well as federal grants and loans.  See id. at 1446-53; Ayers I, 674 F. Supp. at 1546-48.  In its overall findings of liability, the district court concluded that "[f]unding policies and practices follow the mission assignments and, to that degree only, are traceable to prior de jure segregation."  Ayers II, 879 F. Supp. at 1477.  We discuss each source of state funding and the relevant findings of the district court in turn.

The Board is responsible for allocating the legislative general support appropriation among the universities.  Beginning in 1974, the Board utilized a funding formula that allocated this funding to the universities in accordance with their mission designations.  In November of 1987, following the first trial, the Board adopted a new funding formula under which level of funding is determined by the size of a university's enrollment,

83

faculty, and physical plant.  Id. at 1449 & n.122.  The 1987

funding formula consists of eight components:  instruction,

research, public service, academic support, student services,

institutional support, operation and maintenance, and

scholarships and fellowships.  Id. at 1447.  By far the largest

of these components is instruction, which accounted for more than

58% of the total budget in fiscal year 1994-95.  Id.  The general

support appropriation does not include funds for capital

improvements.  Id.

> The district court found that

> because the size of the university's enrollment
> determines the level of funding, the larger
> institutions with the highest percentage of upper level
> programs obtain the greatest amount of funding.  This
> causes practically the same result as under the
> previous formula that funded by institutional mission
> designation.

Id. at 1449.  Stated differently, the court found that "the

historical disparity in funding between the HWIs and HBIs once

practiced by law persists through perpetuation of the status quo

as it existed then."  Id. at 1452-53.  The court concluded,

however, that

> [c]urrent policies and practices governing funding
> of institutions are lawful.  There is no per se funding
> policy or practice traceable to the de jure era.
> Attainment of funding "equity" between the HBIs and
> HWIs is impractical and educationally unsound.  It can
> neither be attained within our lifetime nor . . . does
> it realistically promise to guarantee further
> desegregation given the present institutional
> landscape.  The testimony showed that the formula is
> largely geared to funding the students without
> consideration of race at whichever institution the
> students choose to attend and at the program level the
> students choose.  Accordingly, the court finds that the
> funding formula should not be altered.

84

Id. at 1453.

Line item appropriations fund specific activities and programs offered at the public universities. Capital improvements and repair and renovation of existing facilities are funded through a combination of line item appropriations and self-generated funds. The district court found that line item funding accounts for a "substantial" share of total state appropriations for institutions of higher education and contributes "significantly" to the quality of any given institution. Id. at 1451.

The district court found that, in general, line item funding "disproportionately flows to the HWIs." Id. In the context of capital improvements and repair and renovation, however, the court concluded that funding policies and practices do not follow the mission assignments and are not traceable to de jure segregation. Id. at 1477. Although the State provided new construction funds disproportionately to the HWIs during the late 1960s, figures from 1970 through 1994 indicate that the HBIs received a percentage of capital improvements funds that exceeded their percentage of systemwide enrollment. Id. at 1454.[69]

---

[69] From 1970 through 1980, when the HBIs had approximately 25% of the total systemwide enrollment, the HBIs received 39% of the state appropriations for new construction. From 1981 until 1994, the HBIs averaged 22% of systemwide enrollment yet obtained 32% of total funding available for capital improvements. Ayers II, 879 F. Supp. at 1454; see also Ayers I, 674 F. Supp. at 1548-49.

We note that these findings appear to conflict with evidence credited by the district court that no HBI received a line item appropriation until 1993. See Ayers II, 879 F. Supp. at 1451.

The district court made distinct findings with respect to library allocations and equipment availability.  The court found that the library collections of the HWIs have been consistently superior to those of the HBIs for the past 40 years, and that the physical space of the HBIs' libraries is "of a lesser quality overall" than that of the HWIs' libraries.  Id. at 1456-57.  The court likewise found that investment in equipment at the HWIs exceeded that provided to the HBIs during the de jure era and that, currently, the quality of fixed equipment at the HBIs is inferior to that at the HWIs.  Id. at 1457.  The court concluded that "[p]olicies and practices governing equipment availability and library allocations follow the mission assignments and, to that degree, are traceable to de jure segregation."  Id. at 1477.

As to the present segregative effects of library and equipment funding policies, the district court found generally that "[t]he nature and condition of facilities of a campus are factors that influence student choice in deciding where to attend college."  Id. at 1457.  With respect to equipment in particular, the court found that "[t]he quality and type of equipment available on a campus is important from the student's standpoint in terms of adequately preparing the student to enter the job market."  Id.  As to libraries, the court recognized that, as part of an institution's image, the library "plays a part in the recruitment of students and faculty," id. at 1456, but also found

---

No party, however, challenges either finding, and resolution of this apparent discrepancy is not essential to our ruling on the issue of funding.

that "the number of books in the library is [not] a significant feature of a university that influences student choice of where to attend."  Id. at 1457.  In light of these findings, the court ultimately concluded that "increasing the size of the HBIs' libraries beyond that consistent with their missions is not educationally sound."  Id. at 1458.  The court found it significant that the libraries at Alcorn State and Jackson State are presently undergoing expansion.  Id.[70]

The remedial decree orders the State to provide special funds to both Jackson State and Alcorn State in addition to the funds necessary for the programmatic additions outlined earlier.[71]  At Jackson State, the State is to provide, per Board proposal over a five-year period, up to $15 million earmarked for property acquisition, campus entrances, campus security, and grounds enhancement.  For the benefit of Jackson State and Alcorn State, respectively, the State is to establish two $5 million endowment trusts, "with the income therefrom to be used to provide funds for continuing educational enhancement and racial diversity, including recruitment of white students and scholarships for white applicants in a number and an amount

---

[70]  The court found that the State legislature had recently approved a $12 million expansion of the library at Jackson State, already underway at the time of the district court's opinion.  Expansion of the library at Alcorn State was also underway, with $3 million having already been invested.  Ayers II, 879 F. Supp. at 1457.

[71]  The decree contains a general provision that orders the State to provide funding for all measures ordered therein.  Ayers II, 879 F. Supp. at 1496.

determined by the court upon recommendation from the Monitoring Committee."  Id. at 1495.[72]

    b.    Arguments on appeal

Plaintiffs argue that the district court misapplied Fordice in concluding that "[t]here is no per se funding policy or practice traceable to the de jure era."  Plaintiffs contend that disparities in current funding are traceable to the de jure system, have discriminatory effects, and should be reformed to the extent practicable and consistent with sound educational practices.

Plaintiffs also contend that the district court erred by failing to consider adjustments to the funding formula to take into account student financial need and the higher costs of remedial education, "or increases in funding to the [HBIs] to aid them in overcoming the cumulative effects of decades of underfunding."  U.S. Br. at 44.[73]  Plaintiffs specifically request funding to enhance existing facilities, including

---

[72]    The court found that "the endowment for JSU . . . and the funds proposed to be set aside to purchase adjoining land are sound steps toward correcting JSU's image."  Ayers II, 879 F. Supp. at 1485.  Likewise, the court found that "the proposed funding for the small farm development center and the proposed endowment . . . promise realistically to solve ASU's other-race presence problems and is [sic] otherwise educationally sound."  Id. at 1486.

[73]    Plaintiffs suggest in their briefs that the district court erroneously focused solely on achieving funding "equity" between the HBIs and the HWIs.  While the district court found that "[a]ttainment of funding 'equity' between the HBIs and HWIs is impractical and educationally unsound," Ayers II, 879 F. Supp. at 1453, the court did not purport to rely exclusively on this finding for its determination that "the funding formula should not be altered."  Id.

libraries and equipment, at the HBIs.[74]

Defendants contend that the district court correctly found that no current funding policy is traceable to de jure segregation. Moreover, defendants argue that the dedication of funds for general institutional enhancement does not contribute to the desegregation of historically black institutions.

### c. Analysis

We find the district court's ruling to be supported by the record and consistent with Fordice. Fordice required the district court to examine challenged policies and practices to determine if they had roots in the de jure era. The district court correctly focused on the traceability of policies and practices that result in funding disparities rather than the traceability of the disparities themselves, as plaintiffs urge.

The district court did not clearly err in finding that the funding formula itself is not traceable to de jure segregation. Unlike the previous formula, which allocated funds based on mission designations, the present formula allocates funds as a function of the size of each institution's enrollment, faculty, and physical plant. While the formula responds to conditions that to a significant degree have resulted from the mission designations (and consequently results in the HWIs receiving a

---

[74] Plaintiffs request funding to develop and support new or transferred programs and to enhance existing programs. Their arguments relating to programs have been addressed in Parts III.B.2 and III.B.3 supra. Plaintiffs also suggest that funding increases at the HBIs could provide resources to hire new faculty or increase the pay of existing faculty. Arguments related to faculty hiring and salaries are addressed in Part III.C infra.

89

greater proportion of funds), the manner in which the formula does so is guided by valid educational concerns and is not linked to any prior discriminatory practice.

Plaintiffs argue that the district court should have considered adjustments to the funding formula in two respects, neither of which has merit. First, plaintiffs argue that the formula should be adjusted for the higher cost of remedial education, citing evidence that a disproportionately high number of black students in Mississippi are underprepared for college and that such an adjustment would encourage the HWIs to provide remedial courses and to attract black students and would aid the HBIs in providing the remedial instruction needed by their students. Plaintiffs have not, however, identified any traceable policy related to the funding of remedial education, nor have they identified any record evidence that remedial education as structured under the remedial decree is or is likely to be underfunded; the decree itself requires the State to provide funding for the summer program. If, after examination of the results of the summer program implementation, the district court finds that the program needs to be modified or expanded, then the district court should order appropriate funding at that time.[75] We have also ordered the district court to reconsider paragraph 2

---

[75] Private plaintiffs contend that because the funding formula does not provide additional funds to meet the needs of less adequately prepared students, the formula encourages HWI "disinterest" in using available exceptions to admissions. This argument is moot in light of our ruling on undergraduate admissions standards.

90

of the remedial decree insofar as it eliminates the remedial courses previously offered at each of the eight universities. If, after such reconsideration, the district court concludes that any or all of these courses should be reinstated, then it should order appropriate funding.

Second, plaintiffs argue that the funding formula should be adjusted to take into account the proportion of students at a university who are in need of financial aid. As it currently operates, the funding formula provides funds for scholarships and fellowships (which are only a portion of the total financial aid available to students at each university) on the basis of each university's tuition income.[76] The district court found that this practice is neither unusual nor unique to Mississippi, but that in Mississippi the universities that charge the highest tuition -- the three comprehensive HWIs -- also generally have the largest proportion of students who have little or no need for financial assistance. Ayers II, 879 F. Supp. at 1451. Again, however, plaintiffs have identified no traceable policy

---

[76] According to evidence presented by the Board, the "scholarships and fellowships" component of the formula is defined as follows:

> Includes expenditures for scholarships and fellowships in the form of outright grants to students selected by the institution and financed from current funds, restricted or unrestricted. It also should include trainee stipends, prizes, and awards. The recipient of an outright grant is not required to perform service to the institution as consideration for the grant, nor is he expected to repay the amount of the grant to the funding source.

Bd. R-274.

concerning the adequacy of scholarship and fellowship funds provided to the HBIs.  Any potential segregative effects of the failure of the formula to take financial need into account is a function of the socioeconomic status of black applicants, not a traceable policy of the de jure system.

Plaintiffs' argument for general funds to enhance facilities is not supported by this record.  The district court found "no pattern of inequity in funding in recent years for the HBIs as a group" with respect to facilities.  Id. at 1457.  The court's finding that funding for capital improvements and repair and renovation disproportionately benefitted the HBIs during the 1970s and 1980s is supported by the record, as is the court's finding that the inferior maintenance of the HBIs is not due to funding inequities but may result from decisions at the HBIs to set aside operation and maintenance funds for other uses.  See id. at 1455, 1458.

As to library allocations, the district court's finding that it would be educationally unsound to increase the size of the holdings of a university's library beyond the scope of its mission is not clearly erroneous.  Funds for library acquisitions are provided through the academic support component of the funding formula, and plaintiffs identify no evidence that this method of providing library funding is itself traceable to the de jure system.

The court's findings and conclusions concerning equipment funding are more difficult for us to interpret.  The court found

92

that the quality of fixed equipment, such as science lab furnishings, at the HBIs is inferior to that at the HWIs.  Id. at 1457.  Likewise, the court found that the technical and scientific equipment at the HWIs is "more advanced and generally in better condition than that of the HBIs."  Id.  We are unable to determine based on this record, however, whether these equipment disparities implicate the funding formula, line item appropriations for capital improvements, or self-generated funds. Nor are we able to determine the reasons for the disparities, which the district court opinion leaves unexplained.  The court's determination that policies and practices governing equipment availability follow the mission assignments is perplexing in view of overlaps in the missions of the eight universities.  Each university offers, for instance, undergraduate instruction. Undergraduate instruction in foreign languages, chemistry, biology, or computing, to take a few examples, benefits from the availability of appropriate equipment.  Libraries likewise benefit from the availability of modern technological equipment. There is no apparent reason why the mission assignments, insofar as they relate to common university features such as these, should result in disparities in equipment quality between the HBIs and the HWIs.  Put somewhat differently, if the different mission assignments are adduced as a reason for marked disparities in equipment that is necessary or desirable for the undergraduate education that is provided at all eight universities, then they may indicate the existence of a policy or

93

practice traceable to the de jure era that has present segregative effects in that equipment quality may affect student choice. We therefore remand the issue of equipment funding to the district court for further factfinding on the causes of the disparities. To the extent the disparities are attributable to the mission assignments and have segregative effects that will be reduced by additional funding, relief may be in order.

### d. Conclusions regarding funding

We affirm the district court's findings and conclusions regarding funding, except with regard to funding of equipment. We remand the issue of equipment funding to the district court for further factfinding on the cause and segregative effect of the disparities, and, if necessary, the implementation of appropriate relief.

## C. Employment of Black Faculty and Administrators

At both the 1987 and 1994 trials, plaintiffs challenged defendants' employment policies and practices on the ground that they perpetuated segregation by resulting in racially identifiable faculty and administrators at Mississippi's public institutions of higher education and in race-based differences in faculty rank, tenure, and salary. Id. at 1459. After hearing extensive testimony on remand, the district court found that no current employment policies or practices are traceable to de jure segregation. Id. at 1477.

Plaintiffs contend on appeal that the dearth of black

94

faculty and administrators at the HWIs is traceable to the dual system and continues to have segregative effects by impeding the ability of those institutions to recruit black students.  While not challenging the district court's finding that the HWIs have been making genuine efforts to recruit more black faculty and have hired more black faculty than would be statistically predicted, plaintiffs nevertheless argue that this finding addresses only entry-level hiring and not the limited employment of blacks in tenured faculty and administrative positions.  Plaintiffs therefore maintain that the district court was constitutionally required to order the Board to increase efforts to hire and promote more black individuals to these levels.  In addition, plaintiffs contend that the district court should have ordered relief with regard to the disparities in faculty salaries at the HBIs and HWIs.

Under the de jure system, no blacks served as faculty, administrators, or managers at the HWIs.  Id. at 1459.  The district court found during the initial trial in this case that Mississippi has since adopted race-neutral hiring practices.  Id.  As the district court recognized, however, the inquiry on remand must go beyond implementation of race-neutral practices and focus "upon the identification of remnants within the hiring process that continue to foster segregation or the racial identifiability of the institutions of higher learning in Mississippi."  Id.

Although the district court found that the HWIs remain racially identifiable at the level of administrators and tenured

95

faculty,[77] id. at 1462, it also found that since 1974 the HWIs
have hired more black faculty than would be expected based on a
statistical analysis of the qualified labor pool and national
hiring demands.  Id. at 1461, 1463.  Mississippi's HWIs compete
with other universities, particularly predominantly black
universities, as well as business, industry, and government for
the relatively small number of blacks who earn doctorate degrees
each year.[78]  Id. at 1461.  Under these circumstances, the
district court found that "[a]lthough the racial predominance of
faculty and administrators at the HWIs and the shortage of
qualified black faculty are to some extent attributable to de
jure segregation, the HWIs are making sincere and serious efforts
to increase the percentages of African-American faculty and
administrators at these institutions."  Id. at 1463.

The relatively small number of blacks in tenured faculty and
administrative positions at the HWIs may be attributable at least
in part to the de jure system, but racial identifiability at
these levels itself does not establish a constitutional

---

[77]  For the period 1986-92, 94% of the full professors at
the HWIs were white, and only 2% were black.  For fiscal year
1992, 98% of the administrators at the HWIs were white, and 2%
black.  Ayers II, 879 F. Supp. at 1460.

[78]  In 1991, for instance, blacks earned 3.8% of doctorates
awarded to U.S. citizens nationwide.  Ayers II, 879 F. Supp. at
1461.  In general, only about 40% of black holders of doctorates
earned in any given year move into academia.  Id.  The district
court's  1987 findings reflect a similar shortage of minority
scholars; in addition, the district court found that out-of-state
institutions are frequently able to use higher salaries to lure
black professors away from Mississippi universities after they
have gained experience.  Ayers I, 674 F. Supp. at 1537-38.

violation.  See Fordice, 505 U.S. at 743.  As we noted earlier, Fordice rejects the notion that the State must remedy all present discriminatory effects without regard to "whether such consequences flow from policies rooted in the prior system."  Id. at 730 n.4.  Plaintiffs identify no such policies with respect to selection of tenured faculty and administrators.[79]  The district court found, rather, that black doctorate holders are relatively few and in high demand,[80] that representation of blacks in the faculty ranks of the HWIs exceeds reasonable expectations, and that the HWIs actively employ a variety of measures to attract and retain qualified black faculty.  Ayers II, 879 F. Supp. at 1461-62.

---

[79]  With respect to administrative positions, private plaintiffs contend that the district court failed to consider evidence indicating that the Board approves all such hires, and in the case of at least three institutions the Board makes such approvals with knowledge of the race of the prospective employees.  Private plaintiffs link this practice with evidence that in the history of the system, only nine black persons have served at the level of dean or above at the HWIs, and with testimony of black faculty members concerning unsuccessful efforts to secure administrative positions at MSU.

We find that the district court did not err by failing to find a traceable practice on the basis of such evidence.  Without more, these facts are insufficient to establish that the Board maintains a practice of discriminating against black candidates for administrative openings; notably absent is any claim that the Board refused to approve any qualified black candidates.

[80]  The district court did not link the limited number of black doctorate holders with the dearth of high-level black administrators.  We note that there is record evidence to indicate that, to the extent that a terminal degree is a necessary or desirable qualification for an administrative position (as it may be, for example, in the case of an academic dean), the scarcity of black doctorate holders found by the district court would adversely affect the number of high-level black administrators.

The very low percentages of blacks holding either full professor status or administrative rank at the HWIs are indeed a sobering reflection of longstanding efforts to limit the educational opportunities of black citizens, not in Mississippi alone.  In view of the above findings, however, and combined with the lack of evidence linking any present policies to the de jure system, we find no error in the district court's ruling.  We conclude that the district court correctly applied the standards articulated in Fordice in determining that "[t]here is no current policy or practice in a relevant sense that produces the shortage of available black faculty, nor can liability be based on prior exclusionary admissions policies and practices that reduced the qualified pool, in light of the State's continuous substantial affirmative efforts to correct this imbalance."  Id. at 1463.

With respect to disparities in faculty salaries, the district court did not err in declining to order relief in light of its finding that such disparities reflect legitimate differences, keyed to discipline and rank, in average faculty salaries at peer institutions in the region.  Id. at 1459.  The court found it significant, moreover, that, although funding for faculty salaries is provided by the State under the formula, each institution has the autonomy to determine the number of faculty positions needed, their rank within the university, and the compensation for that rank.  Id.  Finding no traceable policy, the court properly declined to order relief.

We affirm the district court's findings of fact and

98

conclusions of law on the subject of the defendants' employment policies and practices.

D.    System Governance

Plaintiffs argued before the district court that vestiges of the de jure system could be found with respect to the composition of the Board and its staff.  All institutions of higher learning in Mississippi have been governed by a single entity -- the Board of Trustees of State Institutions of Higher Learning -- since 1932.  No black person served on the Board until 1972, and no black person was appointed to serve as a professional staff member until 1974.  Id. at 1473.  At present, the twelve members of the Board are appointed by the governor with the advice and consent of the Mississippi senate.

The district court found no evidence of a current practice of denying or diluting the representation of black citizens on the Board.  Id.  At the time of trial, the Board had three black members and its immediate past president was black.  Id.  Of the Board's 108 employees, 26 were black.  Id.  The district court noted that black Board staff members hold professional positions of responsibility such as Assistant Commissioner for Academic Affairs and Associate Commissioner of Academic Affairs.  Id.

Private plaintiffs contend that the district court ignored evidence of Board selection practices that minimize the participation of black persons on the Board, as well as evidence of the Board's practice of hiring blacks for only low-level

positions on staff.

With respect to Board composition, private plaintiffs cite evidence that from 1972 to 1992, only six out of 24 to 30 newly seated Board members were black. We are unable to conclude on the basis of this bare statistic that the district court clearly erred in finding no traceable policy or practice concerning Board composition. After reviewing both the history of black persons' exclusion from the Board and the post-1972 role of black Board members, the district court found that "[t]he fact that blacks have actively participated on the Board for more than twenty years indicates that no current exclusionary policy exists." Id. As with employment, numerical disparities alone do not establish liability for maintaining remnants of the prior dual system.

With respect to Board staff, private plaintiffs advance two related contentions. First, they argue that the district court's findings regarding staffing totals are clearly erroneous. After reviewing the record, we conclude that this argument is without merit.[81] Second, private plaintiffs argue that a significant majority of staff positions held by blacks are in low-level job categories. This argument is unavailing for reasons similar to those discussed above; private plaintiffs rely on employment figures without regard to other information that might reveal a

_____

[81] Private plaintiffs argue that blacks held only 23 of a total of 105 staff positions in 1992. Private plaintiffs' own exhibit, however, indicates that the district court did not err in its finding that blacks held 26 of 108 staff positions in that year. Private plaintiffs offer no explanation in their briefs for this disparity.

traceable practice with discriminatory effects, such as the relevant pool of qualified candidates or the particulars of the appointment process. Accordingly, we do not disturb the district court's finding of no traceable policy or practice in the area of system governance. We affirm the district court's findings of fact and conclusions of law on the subject of system governance.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, we affirm the district court's findings of fact, conclusions of law, and remedial decree except as follows:

1.  In affirming the district court's implementation of the Board's admissions standards, we do not affirm the elimination of the remedial courses previously offered at each of the eight universities. We remand this issue for immediate reconsideration in the light of this opinion. If the district court concludes that any or all of the previously offered remedial courses should be reinstated, the same should be implemented, with appropriate funding, to be effective beginning with the academic year 1997-98. The district court should provide findings of fact and conclusions of law in support of its decision regarding reinstatement.

2.  We reverse the district court's finding that the use of ACT cutoff scores as a criterion for the

award of scholarships at the HWIs is not traceable to the de jure system and does not currently foster segregation.  We remand for determination of the practicability and educational soundness of reforming this aspect of the undergraduate scholarship policies at the HWIs and the implementation, if necessary, of appropriate remedial relief to be effective beginning with the academic year 1998-99.

3.  We direct the district court on remand to clarify the status of the Board's proposal to merge Mississippi Valley State with Delta State and, if the district court confirms that merger will no longer be pursued, to vacate paragraph 12 of the remedial decree and to incorporate into the remedial decree (a) a provision directing the Board to study and to report to the Monitoring Committee on new academic programs that have a reasonable chance of increasing other-race presence at Mississippi Valley State and (b) a provision requiring the Board to study and to report to the Monitoring Committee on unnecessary program duplication between Mississippi Valley State and Delta State.

4.  We direct the district court on remand to incorporate into the remedial decree a provision directing the Board to study and report to the Monitoring Committee on new academic and land grant

102

programs that have a reasonable chance of increasing other-race presence at Alcorn State.

5.  On the issue of accreditation, the district court should determine the status of current efforts to achieve accreditation of existing business programs at Jackson State and order appropriate relief, if necessary, to ensure that the Board is taking steps commensurate with its role in this accreditation process.

6.  We remand the issue of equipment funding to the district court for further factfinding on the cause and segregative effect of the disparities, and, if necessary, the implementation of appropriate relief.

We understand the district court's continuing jurisdiction to encompass the evaluation of the effectiveness of the spring screening and summer remedial program, as a component of the admissions system, in achieving its intended objectives of identifying and admitting those students who are capable, with reasonable remediation, of doing college level work but who fail to qualify for regular admission.  If the district court ultimately concludes that this program (as it may be modified) is unable to any significant degree to achieve its objectives, then the court should, if possible, identify and implement another practicable and educationally sound method for achieving those objectives in sufficient time for the academic year 1999-2000. If, after examination of the results of the summer program

103

implementation, the district court finds that the program needs to be modified or expanded, then the district court should order appropriate funding at that time.

Any further appeals shall be to this panel.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED for further proceedings consistent with this opinion.  Each party shall bear its own costs.